No. 25-50661

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

NATIONAL INFUSION CENTER ASSOCIATION, *on behalf of itself and its members*;
GLOBAL COLON CANCER ASSOCIATION, *on behalf of itself and its members*;
PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,
*on behalf of itself and its members*,
*Plaintiffs-Appellants*,

v.

ROBERT F. KENNEDY, JR., *Secretary, U.S. Department of Health and Human Services, in his official capacity*; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; MEHMET OZ, *Administrator of the Centers for Medicare and Medicaid Services, in his official capacity*; CENTERS FOR MEDICARE AND MEDICAID SERVICES,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Texas

## BRIEF FOR APPELLEES

*Of Counsel:*

ROBERT FOX FOSTER
*Acting General Counsel*

ELIZABETH C. KELLEY
*Acting Deputy General Counsel*

JOCELYN S. BEER
*Acting Deputy Associate General Counsel
for Litigation*

KENNETH R. WHITLEY
ANANT KUMAR
*Attorneys
U.S. Department of Health and
Human Services*

ERIC J. HAMILTON
*Deputy Assistant Attorney General*

JUSTIN R. SIMMONS
*United States Attorney*

MICHAEL S. RAAB
MAXWELL A. BALDI
*Attorneys, Appellate Staff
Civil Division, Room 7513
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 532-0211*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellees are all governmental parties. 5th Cir. R. 28.2.1

## STATEMENT REGARDING ORAL ARGUMENT

The Court has scheduled oral argument for October 7, 2025.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... v

INTRODUCTION ............................................................................................. 1

STATEMENT OF JURISDICTION .................................................................. 3

STATEMENT OF THE ISSUES ....................................................................... 3

PERTINENT STATUTES AND REGULATIONS ........................................... 4

STATEMENT OF THE CASE .......................................................................... 4

    A.    Medicare and the Escalating Cost of Prescription Drug Coverage .......... 4

    B.    The IRA's Drug Price Negotiation Program ................................. 8

    C.    Implementing the Negotiation Program ..................................... 10

    D.    Prior Proceedings ......................................................................... 13

SUMMARY OF ARGUMENT ........................................................................ 16

STANDARD OF REVIEW ............................................................................. 18

ARGUMENT ................................................................................................... 18

I.    The Negotiation Program is fully consistent with the nondelegation
doctrine ................................................................................................... 18

    A.    Congress set the policy for CMS to pursue and bounded CMS's
authority in negotiating drug prices ............................................ 18

    B.    The Supreme Court rejected plaintiffs' combination theory in
*Consumers' Research.* .................................................................... 22

II.    The district court correctly rejected plaintiffs' excise-tax claims. ....... 27

    A.    The Anti-Injunction Act and the tax exception to the Declaratory
Judgment Act bar plaintiffs' excise-tax claims. ........................... 27

B.      Plaintiffs excise-tax claims are not redressable. ......................................... 35

C.      The excise tax complies with the Eighth Amendment. ........................... 37

III.    The Negotiation Program complies with the Due Process Clause because it does not deprive plaintiffs any protected interests. ........................... 41

A.      Manufacturers lack any a protected property interest in selling their drugs as part Medicare at particular price. ........................................ 41

B.      The Negotiation Program will not deprive providers of any protected property interests. ....................................................... 47

C.      Patients have no protected interests implicated by the Negotiation Program. ....................................................................................... 50

CONCLUSION ............................................................................................... 51

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*A.L.A. Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935) .................................................................. 19

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach,*
495 F.3d 695 (D.C. Cir. 2007) ................................................. 50

*Alexander v. Americans United Inc.,*
416 U.S. 752 (1974) ............................................................ 28, 32

*Alexander v. United States,*
509 U.S. 544 (1993) ................................................................. 38

*Amalgamated Meat Cutters of N. Am. v. Connally,*
337 F. Supp. 737 (D.D.C. 1971) ............................................. 25

*American Hosp. Ass'n v. Becerra,*
596 U.S. 724 (2022) ................................................................... 4

*American Mfrs. Mut. Ins. Co. v. Sullivan,*
526 U.S. 40 (1999) ................................................................... 41

*American Power & Light Co. v. SEC,*
329 U.S. 90 (1946) ................................................................... 25

*Astra USA, Inc. v. Santa Clara Cty.,*
563 U.S. 110 (2011) ................................................................. 42

*AstraZeneca Pharms. LP v. HHS,*
137 F.4th 116 (3d Cir. 2025) ......................... 3, 41, 42, 44, 45, 47

*Austin v. United States,*
509 U.S. 602 (1993) ................................................................. 38

*Bailey v. George,*
259 U.S. 16 (1922) ................................................................... 30

*Bank of Louisiana v. FDIC,*
919 F.3d 916 (5th Cir. 2019) ................................................... 23

*Baptist Hosp. E. v. HHS,*
802 F.2d 860 (6th Cir. 1986) ................................................... 45

*Bi-Metallic Inv. Co. v. State Bd. of Equalization,*
    239 U.S. 441 (1915) ........................................................................ 24

*Big Time Vapes, Inc. v. FDA,*
    963 F.3d 436 (5th Cir. 2020) .................................................... 20-21

*Biotechnology Indus. Org. v. District of Columbia,*
    496 F.3d 1362 (Fed. Cir. 2007) ..................................................... 45

*Block v. Community Nutrition Inst.,*
    467 U.S. 340 (1984) ........................................................................ 27

*Board of Regents v. Roth,*
    408 U.S. 564 (1972) ........................................................................ 41

*Bob Jones Univ. v. Simon,*
    416 U.S. 725 (1974) ........................................................ 28, 32, 33, 34

*Boehringer Ingelheim Pharms., Inc. v. HHS,*
    No. 24-2092, 2025 WL 2248727 (2d Cir. Aug. 7, 2025) .................... 3, 41, 46, 47, 49

*Booker-El v. Superintendent, Ind. State Prison,*
    668 F.3d 896 (7th Cir. 2012) ..................................................... 49-50

*Bowles v. Willingham,*
    321 U.S. 503 (1944) .................................................................. 25, 47

*Bowsher v. Synar,*
    478 U.S. 714 (1986) ........................................................................ 22

*Bristol Myers Squibb Co. v. HHS,*
    Nos. 24-1820, 24-1821, 2025 WL 2537005 (3d Cir. Sept. 4, 2025) .................... 3, 46

*Burditt v. HHS,*
    934 F.2d 1362 (5th Cir. 1991) ....................................................... 45

*Cares Cmty. Health v. HHS,*
    944 F.3d 950 (D.C. Cir. 2019) ......................................................... 4

*Carter v. Carter Coal Co.,*
    298 U.S. 238 (1936) ........................................................................ 23

*Child Labor Tax Case,*
    259 U.S. 20 (1922) ......................................................................... 30

*CIC Servs., LLC v. IRS,*
    593 U.S. 209 (2021) ............................................................. 31, 32

*City of Los Angeles v. Patel,*
    576 U.S. 409 (2015) .................................................................. 40

*College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,*
    527 U.S. 666 (1999) .................................................................. 49

*Commonwealth Edison Co. v. Montana,*
    453 U.S. 609 (1981) .................................................................. 39

*Coyne-Delany Co. v. Capital Dev. Bd.,*
    616 F.2d 341 (7th Cir. 1980) ..................................................... 42

*Decatur v. Paulding,*
    39 U.S. 497 (1840) .................................................................... 27

*Enochs v. Williams Packing & Navigation Co.,*
    370 U.S. 1 (1962) ...................................................................... 32

*FCC v. Consumers' Rsch.,*
    145 S. Ct. 2482 (2025) ................................... 16, 18, 19, 23, 24, 26

*Flora v. United States,*
    362 U.S. 145, 171-75 nn.37-38 (1960) ................................... 33, 34

*Franklin v. United States,*
    49 F.4th 429 (5th Cir. 2022) .................................................. 27, 28

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2010) .............................................................. 24, 25

*Furlong v. Shalala,*
    156 F.3d 384 (2d Cir. 1998) ...................................................... 48

*Garelick v. Sullivan,*
    987 F.2d 913 (2d Cir. 1993) ...................................................... 45

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) .............................................................. 35, 36

*Hayburn's Case,*
    2 U.S. 408 (1792) ...................................................................... 27

*Hotze v. Burwell,*
    784 F.3d 984 (5th Cir. 2015) ............................................................ 27

*J. W. Hampton, Jr., & Co. v. United States,*
    276 U.S. 394 (1928) .................................................................. 18, 21

*Jefferson Cty. v. Acker,*
    527 U.S. 423 (1999) ........................................................................ 28

*Larson v. United States,*
    888 F.3d 578 (2d Cir. 2018) ........................................................... 34

*Logan v. Zimmerman Brush Co.,*
    455 U.S. 422 (1982) ........................................................................ 41

*Loving v. United States,*
    517 U.S. 748 (1996) ........................................................................ 22

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .................................................................. 36, 37

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ........................................................................ 14

*Mayfield v. U.S. Dep't of Lab.,*
    117 F.4th 611 (5th Cir. 2024) ......................................................... 19

*Memphis Light, Gas & Water Div. v. Craft,*
    436 U.S. 1 (1978) ............................................................................ 41

*Michigan Gambling Opposition v. Kempthorne,*
    525 F.3d 23 (D.C. Cir. 2008) .......................................................... 25

*Miller v. Michaels Stores, Inc.,*
    98 F.4th 211 (5th Cir. 2024) ........................................................... 18

*Minnesota ex rel. Spannaus v. United States,*
    525 F.2d 231 (8th Cir. 1975) .......................................................... 33

*Mistretta v. United States,*
    488 U.S. 361 (1989) ........................................................................ 19

*National Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) .................................................... 28, 29, 30, 46

*Nebbia v. New York*,
  291 U.S. 502 (1934) ............................................................. 44

*Newell Recycling Co. v. EPA*,
  231 F.3d 204 (5th Cir. 2000) ............................................. 39

*NICA v. Becerra*,
  116 F.4th 488 (5th Cir. 2024) ................................. 14, 15, 49

*Northeast Hosp. Corp. v. Sebelius*,
  657 F.3d 1 (D.C. Cir. 2011) ................................................. 4

*Novartis Pharms. Corp. v. HHS*,
  No. 24-2968, 2025 WL 2619133 (3d Cir. Sept. 11, 2025) ................ 3, 29, 31, 33, 36

*Old Dearborn Distributing Co. v. Seagram-Distillers Corp.*,
  299 U.S. 183 (1936) ............................................................. 44

*Olsen v. Nebraska ex rel. Western Reference & Bond Ass'n*,
  313 U.S. 236 (1941) ............................................................. 44

*Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009) ............................................................. 23

*Panama Refin. Co. v. Ryan*,
  293 U.S. 388 (1935) ............................................................. 19

*Patchak v. Zinke*,
  583 U.S. 244 (2018) ............................................................. 26

*Perkins v. Lukens Steel Co.*,
  310 U.S. 113 (1940) ....................................................... 22, 42

*Personal Care Prods., Inc. v. Hawkins*,
  635 F.3d 155 (5th Cir. 2011) ............................................. 48

*Rock River Health Care, LLC v. Eagleson*,
  14 F.4th 768 (7th Cir. 2021) ......................................... 47, 48

*Rocovich v. United States*,
  933 F.2d 991 (Fed. Cir. 1991) ........................................... 33

*Sabri v. United States*,
  541 U.S. 600 (2004) ............................................................. 43

*Shah v. Azar,*
    920 F.3d 987 (5th Cir. 2019) ........................................................................ 48

*Shannon v. United States,*
    521 F.2d 56 (9th Cir. 1975) ......................................................................... 33

*Sharp v. United States,*
    580 F.3d 1234 (Fed. Cir. 2009) ................................................................... 31

*Sheldon v. Sill,*
    49 U.S. (8 How.) 441 (1850) ....................................................................... 23

*South Carolina v. Regan,*
    465 U.S. 36 (1984) ...................................................................................... 34

*Timbs v. Indiana,*
    586 U.S. 146 (2019) ............................................................................... 37, 38

*Touby v. United States,*
    500 U.S. 160 (1991) ............................................................................... 20, 26

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) .................................................................................... 35

*United States v. Alt,*
    83 F.3d 779 (6th Cir. 1996) ......................................................................... 40

*United States v. Bajakajian,*
    524 U.S. 321 (1998) ............................................................................... 38, 39

*United States v. Bozarov,*
    974 F.2d 1037 (9th Cir. 1992) ..................................................................... 26

*United States v. Clintwood Elkhorn Min. Co.,*
    553 U.S. 1 (2008) ........................................................................................ 35

*United States v. 817 N.E. 29th Drive,*
    175 F.3d 1304 (11th Cir. 1999) ................................................................... 39

*United States v. Garfinkel,*
    29 F.3d 451 (8th Cir. 1994) ......................................................................... 25

*United States v. Gordon,*
    580 F.2d 827 (5th Cir. 1978) ....................................................................... 25

*United States v. Grimaud,*
    220 U.S. 506 (1911) ............................................................. 19

*United States v. Hansen,*
    599 U.S. 762 (2023) ............................................................. 40

*United States v. Jalaram, Inc.,*
    599 F.3d 347 (4th Cir. 2010) .............................................. 38

*United States v. Sanchez,*
    340 U.S. 42 (1950) ............................................................... 31

*United States v. Tingey,*
    30 U.S. 115 (1831) ............................................................... 21

*United States v. Toth,*
    33 F.4th 1 (1st Cir. 2022), *cert. denied,*
    143 S. Ct. 552 (2023) ........................................................... 38

*United States ex rel. Spay v. CVS Caremark Corp.,*
    875 F.3d 746 (3d Cir. 2017) ................................................. 5

*Utah v. Su,*
    109 F.4th 313 (5th Cir. 2024) ............................................. 27

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) ............................................................. 25

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ............................................................. 50

*Weinberger v. Salti,*
    422 U.S. 749 (1975) ............................................................. 35

*Whitman v. American Trucking Ass'ns,*
    531 U.S. 457 (2001) ................................................. 19, 20, 25

*Yakus v. United States,*
    321 U.S. 414 (1944) ............................................................. 20

## U.S. Constitution:

Art. I, § 1 ............................................................................. 18

Amend. V ............................................................................. 41

Amend. VIII ............................................................................................ 37

**Statutes:**

Act of Feb. 23, 1795, 1 Stat. 419, 419 ...................................................... 21

Inflation Reduction Act of 2022,
    Pub. L. No. 117-169, 136 Stat. 1818 ............................................... 1
      §§ 11001-11003, 136 Stat. at 1833-64
        (codified at 42 U.S.C. §§ 1320f-1320f-7 and 26 U.S.C. § 5000D) ..................... 8
      § 11001(c), 136 Stat. at 1854 .......................................... 10, 11

Social Security Amendments of 1965,
    Pub. L. No. 89-97, tit. I, 79 Stat. 286, 290-353 ............................... 4
      42 U.S.C. § 1395 *et seq.* ............................................ 4
      42 U.S.C. § 1395w-3a(b) ............................................. 7
      42 U.S.C. § 1395w-3a(b)(1) .......................................... 4
      42 U.S.C. § 1395w-3a(b)(1)(A)-(B) ................................... 48
      42 U.S.C. § 1395w-3a(b)(3) .......................................... 48
      42 U.S.C. § 1395w-101 *et seq.* ..................................... 5
      42 U.S.C. § 1395w-111(i) ............................................ 5
      42 U.S.C. § 1395w-112(b) ............................................ 5
      42 U.S.C. § 1395w-114a(b)(4)(B)(i) ................................. 46
      42 U.S.C. § 1395w-114c(b)(4)(B)(i) ................................. 46
      42 U.S.C. § 1395w-115 ............................................... 5

26 U.S.C. § 5000D ............................................................... 30, 36

26 U.S.C. § 5000D(a) ............................................................... 30

26 U.S.C. § 5000D(a)(1) ............................................................ 30

26 U.S.C. § 5000D(a)(2) ............................................................ 30

26 U.S.C. § 5000D(a)-(h) ........................................................... 10

26 U.S.C. § 5000D(b) ............................................................... 39

26 U.S.C. § 5000D(c) ............................................................... 30

26 U.S.C. § 5000D(c)(1) ............................................................ 10

26 U.S.C. § 5000D(d) ............................................................... 40

26 U.S.C. § 5000D(d)(4) ............................................................... 40

26 U.S.C. § 5000D(f)(2) ................................................................ 30

26 U.S.C. § 5000D(h) .................................................................... 36

26 U.S.C. § 7421(a) ........................................................... 27, 29, 31

26 U.S.C. § 7422 ............................................................................ 33

26 U.S.C. § 7701(a)(11)(B) ........................................................... 36

28 U.S.C. § 2201(a) ....................................................................... 28

28 U.S.C. § 1291 .............................................................................. 3

28 U.S.C. § 1331 .............................................................................. 3

28 U.S.C. § 1346 .............................................................................. 3

28 U.S.C. § 1346(a)(1) ................................................................... 33

28 U.S.C. § 1491 ............................................................................ 33

28 U.S.C. § 2201(a) ....................................................................... 28

38 U.S.C. § 8126(a) .......................................................................... 1

38 U.S.C. § 8126(a)-(h) ............................................................. 8, 42

42 U.S.C. § 1320f(a) ........................................................................ 1

42 U.S.C. § 1320f(a)(4) ................................................................. 36

42 U.S.C. § 1320f(b) ...................................................................... 12

42 U.S.C. § 1320f(d) ...................................................................... 12

42 U.S.C. § 1320f-1(a) .............................................................. 9, 21

42 U.S.C. § 1320f-1(b) .......................................................... 1, 9, 20

42 U.S.C. § 1320f-1(d) .......................................................... 1, 9, 20

42 U.S.C. § 1320f-1(e) .......................................................... 1, 9, 20

42 U.S.C. § 1320f-2 ................................................................... 9

42 U.S.C. § 1320f-2(a) ............................................................ 12

42 U.S.C. § 1320f-3 ................................................................... 9

42 U.S.C. § 1320f-3(b) ............................................................ 12

42 U.S.C. § 1320f-3(b)(1) ........................................... 9, 15, 20

42 U.S.C. § 1320f-3(c) ........................................................ 9, 21

42 U.S.C. § 1320f-3(e) ........................................................ 20, 21

42 U.S.C. § 1320f-5(a)(6) .................................................. 20, 21

## Regulatory Materials:

42 C.F.R. § 423.120(c)(3) ......................................................... 43

48 C.F.R. pt. 15 ........................................................................ 42

48 C.F.R. pt. 215 ...................................................................... 42

Lowering Drug Prices by Once Again Putting Americans First,
    Exec. Order 14,273, 90 Fed. Reg. 16,441 (Apr. 18, 2025) ........................................... 1

## Rule:

Fed. R. App. P. 4(a)(1)(B) ......................................................... 3

## Legislative Materials:

H.R. Rep. No. 116-324, pt. 2 (2019) ................................... 6, 7

S. Rep. No. 116-120 (2019) ......................................................... 6

## Other Authorities:

Nicholas Bagley, *The Puzzling Presumption of Reviewability*,
    127 Harv. L. Rev. 1285 (2014) ................................................ 27

CMS, *Medicare Drug Price Negotiation Program: Negotiated Prices for Initial Price Applicability Year 2026* (Aug. 15, 2024), https://perma.cc/6MVG-BZP8 ................................................................. 12

CMS, *Medicare Drug Price Negotiation Program: Revised Guidance, Implementation of Sections 1191-1198 of the Social Security Act for Initial Price Applicability Year 2026* (June 30, 2023), https://perma.cc/K6QB-C3MM ................................................. 10, 11, 46

CMS, *Medicare Drug Price Negotiation Program: Selected Drugs for Initial Price Applicability Year 2026* (Aug. 2023), https://perma.cc/X37F-RC94 ..................................................... 12

Cong. Budget Office, *A Comparison of Brand-Name Drug Prices Among Selected Federal Programs* (Feb. 2021), https://perma.cc/YY2E-GM97 .................................................... 7

Juliette Cubanski & Tricia Neuman, *A Small Number of Drugs Account for a Large Share of Medicare Part D Spending*, KFF (July 12, 2023), https://perma.cc/2PF2-336Z ............................ 7

Laura E. Dolbow, *Barring Judicial Review*, 77 Vand. L. Rev. 307 (2024) .................................................. 26

*Excise Tax on Designated Drugs*, 90 Fed. Reg. 31 (Jan. 2, 2025) ........................................ 10, 11, 36

*Excise Tax on Designated Drugs; Procedural Requirements*, 89 Fed. Reg. 55,507 (July 5, 2024) (codified at 26 C.F.R. pts. 40, 47) .................... 36

Sarah M.E. Gabriele & William B. Feldman, *The Problem of Limited-Supply Agreements for Medicare Price Negotiation*, 330 JAMA 1223 (2023) .................................................. 7

HHS, *HHS Selects the First Drugs for Medicare Drug Price Negotiation* (Aug. 29, 2023), https://perma.cc/A36P-Z88Z ................................ 11, 12

IRS, *Internal Revenue Manual* § 1.2.1.6.4(6), 2007 WL 9790655 ....................... 33

IRS, Notice No. 2023-52 (Aug. 4, 2023), https://perma.cc/B9JZ-ZG7P ................................ 10, 11, 36, 39, 40

KFF, *10 Prescription Drugs Accounted for $48 Billion in Medicare Part D Spending in 2021, or More Than One-Fifth of Part D Spending That Year* (July 12, 2023), https://perma.cc/4CYL-KYRM ................................................................... 6

Medicare Payment Advisory Comm'n, *Report to the Congress: Medicare and the Health Care Delivery System* (June 2022), https://perma.cc/5X4R-KCHC ................................................................... 7

Office of the Assistant Sec'y for Planning & Evaluation, HHS, *Report to Congress: Prescription Drug Pricing* (May 20, 2020), https://perma.cc/5GEN-LZ7F ................................................................... 6

Michelle Singer, *Under the Influence*, CBS News (Mar. 29. 2007), https://perma.cc/5U9Z-M2YS ................................................................... 5

Staff of H. Comm. on Oversight & Reform, *Drug Pricing Investigation: AbbVie—Humira and Imbruvica* (May 2021), https://perma.cc/Z2KG-ZKW3 ................................................................... 8

**INTRODUCTION**

For more than 30 years, Congress has limited how much federal agencies will pay for prescription drugs. Manufacturers that wish to sell their drugs to the Departments of Defense and Veterans Affairs, for example, do so subject to statutorily defined ceiling prices, and both agencies have authority to negotiate prices below those ceilings. *See* 38 U.S.C. § 8126(a)-(h). In 2022, Congress gave the Secretary of Health and Human Services (HHS) similar authority to address the extraordinary and unsustainable increase in the prices Medicare pays for pharmaceutical products that lack generic competition and that account for a disproportionate share of Medicare's expenses. Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818 (IRA); *see* 42 U.S.C. §§ 1320f(a), 1320f-1(b), (d), (e). Under the IRA's Drug Price Negotiation Program, the Centers for Medicare & Medicaid Services (CMS) can now negotiate the prices that Medicare will pay for a select group of drugs manufactured by companies that choose to sell drugs to Medicare and Medicaid. The Negotiation Program is a critical tool to achieve the government's policy of "optimiz[ing]" "Federal health care programs[] … to provide access to prescription drugs at lower costs to American patients and taxpayers." Lowering Drug Prices by Once Again Putting Americans First, Exec. Order 14,273, 90 Fed. Reg. 16,441, 16,442, § 2 (Apr. 18, 2025); *see also id.* at 16,442, § 3 (directing HHS to improve Negotiation Program).

Plaintiffs assert that the Negotiation Program violates the nondelegation doctrine, imposes excessive fines, and deprives them of property without due process of law. The district court correctly rejected each of these claims.

Plaintiffs bring a nondelegation challenge to a reticulated scheme in which Congress set forth a clear objective for CMS: to obtain the lowest maximum fair price, told CMS which drugs to select for negotiation; set a ceiling price; and required CMS to consider nine factors in negotiating prices. That level of detail far exceeds the intelligible principles found sufficient in a panoply of other nondelegation challenges. Plaintiffs fare no better in packaging their claim under the same sort of "combination theory" of nondelegation that the Supreme Court rejected just last term.

Plaintiffs' Excessive Fines Clause argument fails three times over. First, plaintiffs seek to enjoin collection of a tax, which the Anti-Injunction Act expressly forbids. Second, plaintiffs have not sued the correct agency defendants to obtain effectual relief. And third, the IRA's excise tax is neither punitive nor excessive. Plaintiffs identify no decision holding a tax to violate the Excessive Fines Clause, and for good reason. Taxes are not punishments.

Plaintiffs' due process challenges similarly fail. No plaintiff has established a cognizable property or liberty interest much less a deprivation of that interest. Drug manufacturers do not have a property right to dictate prices when they participate in a government spending program. Providers are entitled only to reimbursement in the amounts established by Congress; they have no property right in the amount the

government is willing to pay for administering drugs. And patients lack any liberty or property interest in the availability of prescription drugs.

Across five appeals, the Second and Third Circuits have already rejected many of the same arguments that plaintiffs raise here. *See AstraZeneca Pharms. LP v. HHS*, 137 F.4th 116, 125-26 (3d Cir. 2025); *Boehringer Ingelheim Pharms., Inc. v. HHS*, No. 24-2092, 2025 WL 2248727, at *7-8, 10 (2d Cir. Aug. 7, 2025) (published); *Bristol Myers Squibb Co. v. HHS*, Nos. 24-1820, 24-1821, 2025 WL 2537005, at *5-8 (3d Cir. Sept. 4, 2025) (published) (consolidated opinion resolving two cases); *Novartis Pharms. Corp. v. HHS*, No. 24-2968, 2025 WL 2619133, at *5-7 (3d Cir. Sept. 11, 2025) (published). This Court should similarly uphold the constitutionality of the Negotiation Program.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C. §§ 1331 and 1346. ROA.30. The district court entered final judgment in favor of the government on August 7, 2025. ROA.1277. Plaintiffs timely noticed this appeal on August 13, 2025. ROA.1278; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I. Whether the district court correctly rejected plaintiffs' nondelegation challenge to the Negotiation Program.

II. Whether the district court correctly rejected plaintiffs' excessive-fines challenge to the Negotiation Program.

III. Whether the district court correctly rejected plaintiffs' due process challenge to the Negotiation Program.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     Medicare and the Escalating Cost of Prescription Drug Coverage

Congress created Medicare in 1965. Social Security Amendments of 1965, Pub. L. No. 89-97, tit. I, 79 Stat. 286, 290-353. Medicare provides federally funded health coverage for individuals who are 65 or older or who have certain disabilities or medical conditions. 42 U.S.C. § 1395 *et seq.* CMS administers Medicare on behalf of the Secretary of HHS.

Medicare is divided into "Parts," which establish the terms under which Medicare pays for specific benefits. *See Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 2 (D.C. Cir. 2011). Medicare Part B covers outpatient care as well as the cost of drugs administered as part of that care. *Cares Cmty. Health v. HHS*, 944 F.3d 950, 953 (D.C. Cir. 2019). CMS generally pays Part B providers at a rate of 106% of the average sales price for most separately payable drugs or biologicals. 42 U.S.C. § 1395w-3a(b)(1); *see American Hosp. Ass'n v. Becerra*, 596 U.S. 724, 729 (2022). For nearly four decades, Medicare did not cover the cost of prescription drugs unless they were administered by medical professionals. That changed in 2003, when Congress enacted

Medicare Part D to provide "a voluntary prescription drug benefit program that subsidizes the cost of prescription drugs and prescription drug insurance premiums for Medicare enrollees." *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 749 (3d Cir. 2017); *see* 42 U.S.C. § 1395w-101 *et seq.* Under Part D, CMS enters into contracts with private entities, known as "sponsors," 42 U.S.C. § 1395w-112(b), and makes payments to them to provide prescription drug plans to Part D eligible individuals, *see id.* § 1395w-115. On average, the government subsidizes 74.5% of expected benefit costs. *See id.* § 1395w-115.

In enacting Part D, Congress initially barred CMS from negotiating Part D drug prices or otherwise interfering in the arrangements between drug manufacturers and insurance plans. 42 U.S.C. § 1395w-111(i); *see also* Michelle Singer, *Under the Influence*, CBS News (Mar. 29. 2007), https://perma.cc/5U9Z-M2YS (documenting extensive pharmaceutical industry efforts to lobby for price-negotiation bar in lead-up to enactment of Part D). But that model led to skyrocketing drug prices that saddled beneficiaries with unaffordable copays and threatened the long-term solvency of the program.

The cost to the federal government of providing prescription drug coverage under Medicare Parts B and D is immense. In 2021 alone, the federal government spent more than $250 billion on drugs covered by these programs. *See* KFF, *10 Prescription Drugs Accounted for $48 Billion in Medicare Part D Spending in 2021, or More Than One-Fifth of Part D Spending That Year* (July 12, 2023), https://perma.cc/4CYL-

KYRM. That figure has risen dramatically over the last decade and is "projected to continue rising during the coming decade, placing increasing fiscal pressure[]" on the federal budget. Office of the Assistant Sec'y for Planning & Evaluation, HHS, *Report to Congress: Prescription Drug Pricing* 8 (May 20, 2020), https://perma.cc/5GEN-LZ7F (2020 Report). Medicare Part D spending in particular "is projected to increase faster than any other category of health spending." S. Rep. No. 116-120, at 4 (2019).

In addition to its effects on the fisc, the high cost of prescription drug coverage directly burdens Medicare beneficiaries by affecting their premiums and out-of-pocket payments. Because Part B premiums are automatically set to cover 25% of aggregate Part B spending, higher total spending on prescription drug coverage results in higher premiums for individual enrollees. *See* 2020 Report 11. Beneficiaries also pay 20% of their Part B prescription drug costs out of pocket. Part D premiums are similarly based on a plan's anticipated costs, and many Part D plans likewise require beneficiaries to pay additional cost-sharing amounts.

A "relatively small number of drugs are responsible for a disproportionately large share of Medicare costs." H.R. Rep. No. 116-324, pt. 2, at 37 (2019). In 2018, "the top ten highest-cost drugs by total spending accounted for 46 percent of spending in Medicare Part B" and "18 percent of spending in … Part D." 2020 Report 7. By 2021, the top 10 drugs by total spending accounted for 22% of spending under Part D. *See* Juliette Cubanski & Tricia Neuman, *A Small Number of*

*Drugs Account for a Large Share of Medicare Part D Spending*, KFF (July 12, 2023),

https://perma.cc/2PF2-336Z.

These rising costs are in large part attributable to manufacturers' considerable

latitude in dictating the prices that Medicare pays for the most expensive drugs.

Because drug prices under Medicare Part B and Part D were tied to the price

manufacturers charged private buyers, *see* 42 U.S.C. §§ 1395w-3a(b), 1395w-101 *et seq.*,

manufacturers of drugs with no generic competition could "effectively set[] [their]

own Medicare payment rate[s]" by dictating sales prices in the broader market.

Medicare Payment Advisory Comm'n, *Report to the Congress: Medicare and the Health Care

Delivery System* 84 (June 2022), https://perma.cc/5X4R-KCHC. Drug companies'

substantial leeway in this respect was compounded by the significant legal and

practical obstacles to market entry faced by generic competitors, along with the

practice of many manufacturers of protecting their market share by entering into

"settlements" with generic manufacturers to limit generic marketing. *See, e.g.*, Sarah

M.E. Gabriele & William B. Feldman, *The Problem of Limited-Supply Agreements for

Medicare Price Negotiation,* 330 JAMA 1223 (2023). As a result of these factors, there are

in many instances "no market forces to apply downward pressure to provide lowered

prices to the millions who have coverage for such medicines under Medicare."

H.R. Rep. No. 116-324, pt. 2, at 37-38.

Other federal agencies, including the Departments of Defense and Veterans

Affairs, operate their drug benefit programs differently and have not been subject to

skyrocketing costs. As a condition on Medicaid participation, manufacturers that wish to sell drugs to the government through these programs have long been required to negotiate with the government and reach agreements subject to statutorily defined ceiling prices. *See* 38 U.S.C. § 8126(a)-(h). As a consequence, manufacturers often sell drugs to these agencies for roughly half as much as they charge Medicare Part D. *See* Cong. Budget Office, *A Comparison of Brand-Name Drug Prices Among Selected Federal Programs* 16 (Feb. 2021), https://perma.cc/YY2E-GM97. "[I]f Medicare had received the same discounts as the Departments of Defense and Veterans Affairs, taxpayers would have saved" billions. Staff of H. Comm. on Oversight & Reform, *Drug Pricing Investigation: AbbVie—Humira and Imbruvica* 13-15 (May 2021), https://perma.cc/Z2KG-ZKW3.

## B.     The IRA's Drug Price Negotiation Program

Through the IRA's Drug Price Negotiation Program, Congress empowered the HHS Secretary, acting through CMS, to negotiate the prices Medicare pays for certain drugs, just as the Department of Defense, the Department of Veterans Affairs, and the Coast Guard have done for decades. *See* IRA §§ 11001-11003, 136 Stat. at 1833-64 (codified at 42 U.S.C. §§ 1320f-1320f-7 and 26 U.S.C. § 5000D). The Negotiation Program applies only to manufacturers that choose to participate in Medicare and Medicaid, and even then, it governs only the prices that Medicare pays for certain drugs. *See* 42 U.S.C. § 1320f-1(b), (d). The Negotiation Program does not dictate the prices paid for sales outside of Medicare Parts B and D.

By statute, only certain drugs are eligible for selection in the Negotiation Program: those that account for the highest Medicare expenditures, that have no generic or biosimilar competitors, and that have been on the market for at least seven years. *See* 42 U.S.C. § 1320f-1(d), (e). For the first negotiation cycle, CMS selects 10 of these drugs with the highest Medicare expenditures for negotiations. *Id.* § 1320f-1(a). Additional drugs will be selected for future negotiation cycles.

After selecting the drugs, CMS signs a Manufacturer Agreement with those manufacturers that are willing to engage in the negotiation process. 42 U.S.C. § 1320f-2. The object of the negotiations is to reach agreement on what the IRA terms a "maximum fair price" that Medicare will pay for each selected drug. *Id.* § 1320f-3. To guide the negotiation process, Congress imposed a "[c]eiling for [the] maximum fair price," which is based on specified pricing data for each drug, *id.* § 1320f-3(c), and directed CMS to "aim[] to achieve the lowest maximum fair price" that the manufacturer will accept, *id.* § 1320f-3(b)(1). If negotiations prove successful, the manufacturer signs an addendum to the Manufacturer Agreement establishing the maximum price at which the drug will be made available to Medicare beneficiaries. *Id.* § 1320f-3.

In enacting the Negotiation Program, Congress revised the terms of its offer to continue purchasing drugs for Medicare and Medicaid. A drug manufacturer that does not wish to participate in the Negotiation Program has several options. Because participation in the Medicare program is a voluntary undertaking, the manufacturer

can withdraw from Medicare and Medicaid and thus not be subject to any of the Negotiation Program's requirements. 26 U.S.C. § 5000D(c)(1); *see also* CMS, *Medicare Drug Price Negotiation Program: Revised Guidance, Implementation of Sections 1191-1198 of the Social Security Act for Initial Price Applicability Year 2026*, at 120-21 (June 30, 2023), https://perma.cc/K6QB-C3MM (Revised Guidance). Alternatively, a manufacturer can transfer its ownership of the selected drug to another entity and continue to sell other drugs to Medicare and Medicaid. *See* Revised Guidance 131-32. A manufacturer that pursues neither of these options may also continue to sell the selected drug to Medicare beneficiaries at non-negotiated prices subject to an excise tax. *See* 26 U.S.C. § 5000D(a)-(h); *see also Excise Tax on Designated Drugs*, 90 Fed. Reg. 31 (Jan. 2, 2025); Internal Revenue Serv. (IRS), Notice No. 2023-52 (Aug. 4, 2023), https://perma.cc/B9JZ-ZG7P (IRS Notice).

> ### C.     Implementing the Negotiation Program

1. In addition to the statutory requirements set out above, Congress instructed CMS to implement the Negotiation Program through "program instruction or other forms of program guidance" for the first three negotiation cycles. IRA § 11001(c), 136 Stat. at 1854. In June 2023, CMS published the Revised Guidance that explains, among other things, how CMS determines which drugs may be selected for negotiation and the procedures for participating in the negotiation process. *See* Revised Guidance 91-92. Starting next year, CMS will be subject to notice and

comment requirements in implementing the Negotiation Program. *See* IRA

§ 11001(c), 136 Stat. at 1854.

The Revised Guidance also sets out procedures for manufacturers that choose

not to participate in the Negotiation Program. Revised Guidance 118-21, 129-31. In

those circumstances, CMS will "facilitate an expeditious termination of" a

manufacturer's Medicare agreement before the manufacturer would incur liability for

any excise tax, so long as the manufacturer notifies the agency of its desire to

withdraw at least 30 days in advance of when the tax would otherwise begin to accrue.

Revised Guidance 33-34. The Treasury Department and the IRS issued a notice

explaining that, when excise tax liability is triggered, the tax will be imposed only on

the manufacturer's "sales of designated drugs dispensed, furnished, or administered to

individuals under the terms of Medicare"—*i.e.*, not on drugs dispensed, furnished, or

administered outside of Medicare. IRS Notice 3. That interpretation is effective

immediately. *See* IRS Notice 5. The Treasury Department and the IRS have reiterated

their understanding of the application of the tax in a proposed rule. *See* 90 Fed. Reg.

31.

2. In August 2023, CMS selected drugs for the first negotiation cycle. *See* HHS,

*HHS Selects the First Drugs for Medicare Drug Price Negotiation* (Aug. 29, 2023),

https://perma.cc/A36P-Z88Z. The 10 drugs selected accounted for more than $50

billion of gross Medicare Part D spending between June 2022 and May 2023, and

Medicare beneficiaries paid a total of $3.4 billion in out-of-pocket costs for those

drugs in 2022 alone. *See id.*; CMS, *Medicare Drug Price Negotiation Program: Selected Drugs for Initial Price Applicability Year 2026* (Aug. 2023), https://perma.cc/X37F-RC94.

In accordance with the schedule established by Congress, CMS presented the manufacturers of selected drugs with initial offers by February 1, 2024. *See* CMS, *Medicare Drug Price Negotiation Program: Negotiated Prices for Initial Price Applicability Year 2026* (Aug. 15, 2024), https://perma.cc/6MVG-BZP8. The manufacturers responded to the initial offers with counteroffers by March 2. *Id.* CMS subsequently held three negotiation meetings with each company to discuss the offers and relevant evidence. *Id.* Many companies proposed revised counteroffers during these meetings, and CMS accepted four of these revised counteroffers outright. *Id.* All in all, CMS reached price agreements for five of the selected drugs in connection with these meetings. CMS sent final written offers to manufacturers of the five remaining drugs by July 15. By August 1, 2024, CMS and the participating manufacturers had agreed to a negotiated price for each of the 10 selected drugs. *Id.* Assuming that none of the 10 manufacturers withdraws from the negotiation agreement by December 2025, these prices will take effect on January 1, 2026. 42 U.S.C. §§ 1320f(b), (d), 1320f-2(a), 1320f-3(b).

CMS has subsequently selected drugs for the second year of the Negotiation Program and is in the process of negotiating prices. If CMS and the manufacturers reach agreement, these prices will take effect January 1, 2027.

### D.    Prior Proceedings

1. Plaintiffs are not drug manufacturers. Rather, they are the National Infusion Center Association (NICA), a trade association representing facilities that administer outpatient infusion treatments; the Pharmaceutical Research and Manufacturers of America (PhRMA), the trade association for the pharmaceutical and biotechnology industries; and the Global Colon Cancer Association (GCCA), a group that advocates for colon cancer patients. ROA.30-32. They sued to challenge the constitutionality of the Negotiation Program. ROA.75-79.

Plaintiffs raise three claims. First, they allege that Congress violated the nondelegation doctrine by "grant[ing] HHS virtually unfettered discretion to set drug prices." ROA.75-76. Second, they allege that Congress violated the Eighth Amendment's Excessive Fines Clause by enacting the excise tax. ROA.77. Third, they alleged that Congress violated the Fifth Amendment's Due Process Clause by depriving their members of property without due process. ROA.78.

2. The government initially moved to dismiss the claims raised by NICA on two alternative jurisdictional grounds: that the Medicare Act's channeling requirement deprived the district court of subject-matter jurisdiction to consider NICA members' preemptive objections to the Medicare payment amounts they expect to receive and that the complaint failed to demonstrate that any NICA member has Article III standing. ROA.458-69. The district court did not reach the standing argument because it held that NICA's claims are jurisdictionally barred by the Medicare Act's

channeling requirement, which requires that a claim affecting Medicare payments first be presented to HHS before it can be the subject of judicial review. ROA.615-21. And because NICA's presence was necessary to establish venue, the district court dismissed the remaining plaintiffs' claims as well. ROA.621-22.

Plaintiffs appealed, and a divided panel of this Court reversed. *NICA v. Becerra* (*NICA I*), 116 F.4th 488 (5th Cir. 2024). The majority concluded that at least one NICA member had established an economic injury because HHS had selected a member-administered drug for the Negotiation Program, because NICA had sufficiently pleaded that the selection of that drug would "lead to a lower price for that drug," and because that lower price would lead to lower revenue for the member. *Id.* at 498-501. The majority further concluded that NICA had demonstrated an economic injury because it pleaded that the Negotiation Program hampered NICA members' ability to raise debt and equity. *Id.* at 502. And the majority concluded that NICA established a procedural injury as well, accepting that NICA had pleaded a concrete interest in the dispute due to the alleged loss of revenue and had "alleged sufficient facts to satisfy the *Mathews* [*v. Eldridge*] test" and assert a due process violation. *Id.* at 503 (citing 424 U.S. 319, 335 (1976)). Turning to statutory jurisdiction, the majority held that the IRA rather than the Medicare Act provided the substantive basis for NICA's claims and, therefore, that the Medicare Act did not require NICA to raise its claims before CMS in the first instance. *Id.* at 505, 509.

Judge Ramirez would have affirmed the district court's judgment. *NICA I*, 116 F.4th at 509-18 (Ramirez, J., concurring in part and dissenting in part).

3. On remand, the district court granted summary judgment to the government. ROA.1280-1319. The district court first held that "the IRA provides sufficient guidance to [the agencies]" to satisfy the nondelegation doctrine. ROA.1293. It explained that Congress provided CMS both a policy goal—"'achiev[ing] the lowest maximum fair price for each selected drug' for which it is able to persuade manufacturers to sign an agreement" and "detailed criteria" to consider in conducting negotiations. ROA.1293 (quoting 42 U.S.C. § 1320f-3(b)(1)). Those constraints, the district court held, "more than suffice to provide guidance to CMS." ROA.1293. And the district court further rejected plaintiffs' argument that the IRA's preclusion of judicial review creates a nondelegation problem. ROA.1297.

Turning to the Excessive Fines Clause challenge, the district court concluded that it lacked statutory jurisdiction to consider the claim. ROA.1306. The district court explained that the Anti-Injunction Act bars plaintiffs' efforts to enjoin collection of the IRA's excise tax, ROA.1301-02, and that neither of the two narrow exceptions to the Anti-Injunction Act apply, ROA.1302-06. Accordingly, the district court rejected plaintiffs' challenge to the excise tax; it did not reach the government's argument that plaintiffs' excessive-fines claim is not redressable. ROA.1301

Finally, the district court held that plaintiffs' due process claims failed because they "cannot demonstrate any deprivation of a protected interest." ROA.1309. The

district court concluded that providers, like those represented by NICA, do not have a property interest in being reimbursed at any specific level. ROA.1311. It concluded that drug manufacturers, like those represented by PhRMA, do not have a property interest in selling drugs as part of Medicare at their preferred prices. ROA.1317. And it concluded that patients, like those represented by GCCA, have no protected interest in obtaining access to specific products through Medicare. ROA.1318.

## SUMMARY OF ARGUMENT

I. The nondelegation doctrine requires only that Congress determine the general policy an agency is to implement and establish the outer boundaries of the agency's delegated authority. Congress did both here, directing CMS to seek to obtain the lowest maximum fair price for selected drugs, requiring CMS to consider a number of factors in formulating offers and counteroffers, and reticulating the scope of the Negotiation Program. The IRA does not violate the minimal requirements of the nondelegation doctrine.

Plaintiffs attempt to aggregate several of their grievances with the Negotiation Program—none of which rises to the level of a constitutional violation—in hopes of stating a nondelegation challenge that way. But the Supreme Court recently rejected the sort of "combination" nondelegation theory plaintiffs offer here. *See FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2510-11 (2025). Plaintiffs fail to distinguish that decision.

II. The Anti-Injunction Act prohibits suits to enjoin collection of taxes, subject only to two narrow exceptions. Plaintiffs seek to enjoin collection of the IRA's excise tax. The district court, thus, correctly recognized that it lacks jurisdiction over their Excessive Fines Clause claims. Neither of the judicially created exceptions to the Anti-Injunction Act apply. Plaintiffs seek to enjoin a divisible tax. Because the tax is divisible, the manufacturer may pay the excise tax on a single sale and then bring a refund suit to challenge the legality of the tax. And plaintiffs certainly cannot show that the government has no prospect of success in defending against their novel constitutional argument. Thus, the district court correctly held that it lacked jurisdiction.

Plaintiffs' excise tax challenges also fail for another threshold reason. Treasury and the IRS administer the excise tax, but plaintiffs did not sue those agencies. Thus, a court cannot provide plaintiffs with effective relief.

If this Court were to reach the merits of the excessive fines claims, plaintiffs still would not succeed. A tax is not a fine, which is why plaintiffs can point to no court decision holding a tax unconstitutional under the Excessive Fines Clause. And, in any event, a tax of $65 to $95 on a $100 sale of a drug within Medicare is not excessive.

III. Plaintiffs' due process arguments also lack merit. The basic prerequisite for a due process claim is deprivation of a protected interest. No plaintiff satisfies that first step. The Negotiation Program governs only the prices paid for drugs purchased

as part of Medicare Parts B and D. Manufacturers do not have a property right to dictate the price the government must pay when it offers to subsidize healthcare programs. Similarly, when providers administer drugs to Part B beneficiaries, they have a right to reimbursement at a statutorily prescribed rate. But they have no property right in determining the amount of reimbursement. And patients have no right of access to prescription drugs, nor have plaintiffs offered any theory of how the Negotiation Program would effect a deprivation of such a right.

## STANDARD OF REVIEW

"The standard of review on summary judgment is de novo." *Miller v. Michaels Stores, Inc.*, 98 F.4th 211, 215 (5th Cir. 2024).

## ARGUMENT

I.    **The Negotiation Program is fully consistent with the nondelegation doctrine.**

A.    **Congress set the policy for CMS to pursue and bounded CMS's authority in negotiating drug prices.**

The Constitution vests legislative power in Congress, U.S. Const. art. I, § 1, but it also permits Congress to "vest discretion in executive agencies to implement and apply the laws it has enacted—for example, by deciding on the details of their execution." *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2491 (2025) (cleaned up); *see also J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928). When Congress leaves implementation of a statute to an agency, it must supply an "intelligible principle," *Hampton*, 276 U.S. at 409, meaning that Congress must "ma[k]e clear both

the general policy that the agency must pursue and the boundaries of its delegated authority." *Consumers' Rsch.*, 145 S. Ct. at 2497 (cleaned up). If Congress meets these undemanding standards, then courts "will not disturb its grant of authority." *Id.*; *see also Mistretta v. United States*, 488 U.S. 361, 372-73 (1989) (a delegation is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority.").

The nondelegation doctrine does not impose a demanding test. *See Mayfield v. U.S. Dep't of Lab.*, 117 F.4th 611, 620 (5th Cir. 2024). Congress has delegated authority to the Executive Branch "[f]rom the beginning of the government," *United States v. Grimaud*, 220 U.S. 506, 517 (1911), and the Supreme Court has "found the requisite 'intelligible principle' lacking in only two statutes, one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 474 (2001) (first citing *Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935); and then citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)). In the more than 90 years since those decisions issued, the Court has upheld a wide variety of challenges to congressional grants of power, including "statutes authorizing the War Department to recover 'excessive profits' earned on military contracts; authorizing the Price Administrator to fix 'fair and equitable' commodities prices; and authorizing the Federal Communications Commission to regulate

broadcast licensing in the 'public interest.'" *Touby v. United States*, 500 U.S. 160, 165 (1991) (citations omitted) (collecting cases).

Congress gave CMS far more guidance in how to implement the Negotiation Program than it provided with respect to many other grants of agency authority that have withstood scrutiny under the nondelegation doctrine. *See, e.g.*, *Yakus v. United States*, 321 U.S. 414, 427 (1944) (rejecting challenge to agency's authority to set "fair and equitable" commodity prices); *American Trucking Ass'ns*, 531 U.S. at 472 (rejecting challenge to agency's authority to set air quality standards at a level "requisite to protect the public health"). Congress provided CMS with a general goal in negotiating with manufacturers: CMS is to "aim[] to achieve the lowest maximum fair price for each selected drug" that the manufacturer will agree to. 42 U.S.C. § 1320f-3(b)(1). And Congress told CMS how to go about achieving that goal, outlining how negotiation-eligible drugs are identified, ranked, and selected, *id.* § 1320f-1(b), (d), (e), and requiring the agency to consider in "determining the offers and counteroffers" during the negotiation a set of nine enumerated factors, *see id.* § 1320f-3(e). On top of this guidance, "Congress restricted [CMS]'s discretion by making many of the key regulatory decisions itself." *Big Time Vapes, Inc. v. FDA*,

20

963 F.3d 436, 445 (5th Cir. 2020); *see, e.g.,* 42 U.S.C. § 1320f-1(a) (number of drugs); *id.* § 1320f-3(c) (ceiling price). Nothing more was required.[1]

The context of this particular grant of authority underscores that conclusion: CMS is engaged in a price negotiation. Federal agencies spend hundreds of billions of dollars every year with far less guidance from Congress over how much to disburse, and Congress has authorized such provisions since the beginning of the republic, *see, e.g.*, Act of Feb. 23, 1795, 1 Stat. 419, 419 (establishing Purveyor of Public Supplies to "conduct procuring and providing of … all articles of supply requisite for the service of the United States" acting "under the direction and supervision of the Secretary of the Treasury"); *United States v. Tingey*, 30 U.S. 115, 126 (1831) ("There is no statute of the United States expressly defining the duties of pursers in the navy."). Indeed, it is difficult to see how the federal government could function if, as plaintiffs posit (at 37), Congress had to specify a floor price before the government could enter agreements to pay for goods. The statutory scheme, of course, imposes another constraint on the floor price: the manufacturer must agree to the price. Manufacturers' ability to pull out of Medicare and Medicaid provide them with

---

[1] Although plaintiffs argue (at 28, 37-39) that the obligation to consider specified factors does not sufficiently constrain the agency, the Supreme Court reached the opposite conclusion in *Hampton*, rejecting a nondelegation challenge to a statute that required "the President, in so far as he finds it practicable, [to] take into consideration" four factors in setting customs duties. *See* 276 U.S. at 401. The IRA goes even further than the statute at issue in *Hampton*, imposing an affirmative obligation on the agency to consider statutory factors, whether or not practicable. 42 U.S.C. § 1320f-3(e) (the agency "shall consider" nine factors).

significant leverage. *See* ROA.1010 (expert conclusion that "both CMS and manufacturers would bear significant costs from a failed negotiation" and that "both parties have strong incentives to negotiate"); *see also infra* pp. 46-47.

Instead of demanding unrealistic statutory specificity, courts heed "the traditional principle of leaving purchases necessary to the operation of our Government to administration by the executive branch of Government, with adequate range of discretion free from vexatious and dilatory restraints at the suits of prospective or potential sellers." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940). In areas of traditional executive authority, like this one, the already undemanding constraints of the nondelegation doctrine are even more relaxed. *See Loving v. United States*, 517 U.S. 748, 772-73 (1996) (explaining that the ordinary "limitations on delegation do not apply where the entity exercising the delegated authority itself possesses independent authority over the subject matter" (cleaned up)); *see also Bowsher v. Synar*, 478 U.S. 714, 733 (1986) (interpreting and implementing a spending statute "is the very essence of 'execution' of the law).

### B.    The Supreme Court rejected plaintiffs' combination theory in *Consumers' Research*.

1. Plaintiffs assert that the combination of three elements—the level of guidance the IRA supplies, the IRA's instruction to implement the Negotiation Program through guidance for the first three years, and the IRA's judicial review bar—render the statutory scheme unconstitutional. But "[t]wo wrong claims do not

make one that is right." *See Consumers' Rsch.*, 145 S. Ct. at 2511 (quoting *Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009)).

In *Consumers' Research*, the Supreme Court rejected a similar "combination" theory in the context of a nondelegation challenge. 145 S. Ct. at 2510-11. There, the Court addressed a statute in which (1) Congress granted authority to the FCC to determine what level of fees would be sufficient to support a program and (2) the FCC relied on a private body to perform calculations and financial projections to set those fees. *See id.* at 2493-95. The Supreme Court held that the combination of these two elements did not amount to a constitutional violation. *See id.* at 2511. The Court explained that the first element implicated the traditional nondelegation doctrine, while the second element implicated the "private nondelegation doctrine," *see generally Carter v. Carter Coal Co.*, 298 U.S. 238, 310-11 (1936). *Consumers' Rsch.*, 145 S. Ct. at 2510. Because "[t]hose doctrines do not operate on the same axis (save if it is defined impossibly broadly)," "a measure implicating (but not violating) one does not compound a measure implicating (but not violating) the other, in a way that pushes the combination over a constitutional line." *Id.* at 2510-11. Each is a separate claim that must rise or fall on its own merits.

The same logic governs here. Congress provided an intelligible principle to CMS, so it did not violate the nondelegation doctrine. *See supra* pp. 18-22. Congress may prohibit judicial review of agency actions. *See Bank of Louisiana v. FDIC*, 919 F.3d 916, 922 (5th Cir. 2019); *see also Sheldon v. Sill*, 49 U.S. (8 How.) 441, 449 (1850). And

there is no constitutional requirement at all for agencies to determine broadly applicable policies only following notice-and-comment procedures. *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445-46 (1915). Therefore, the availability of judicial review and of notice-and-comment procedures is irrelevant to plaintiffs' nondelegation claims.

2. Plaintiffs' efforts to distinguish *Consumers Research* fall flat. They contend that several features of the Negotiation Program "raise[] structural concerns about expansive delegations that lack any guardrails." Br. 36 (quotation marks omitted) (arguing that the scope of CMS's authority, the lack of notice-and-comment rulemaking, and the judicial review bar all exacerbate the same problem). In so arguing, plaintiffs ignore the Supreme Court's admonition against "defin[ing] impossibly broadly" the "axis" along which their arguments operate. *Consumers' Rsch.*, 145 S. Ct. at 2510-11.

Plaintiffs rely (at 35-36) on *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), which held that Congress may not grant two layers of tenure protection to certain executive officers. *But see Consumers' Rsch.*, 145 S. Ct. at 2510 (rejecting "analogy and associated logic" of reliance on *Free Enterprise Fund*). In *Free Enterprise Fund*, the Court stated that a "second level of tenure protection" "transforms" an agency's independence by "chang[ing] the nature of the President's review" of an officer's actions. 561 U.S. at 496. "Neither the President, nor anyone directly responsible to him, nor even an officer whose conduct he may

24

review only for good cause, ha[d] full control over the [agency]." *Id.* That compounding problem bears no resemblance to plaintiffs' arguments against the Negotiation Program. Plaintiffs' argument (at 29-31, 36) that judicial review will prevent agencies from overstepping the authority Congress conferred is not a relevant consideration in nondelegation challenges because the "constitutional question is whether the statute has delegated legislative power to the agency," not how the agency interprets and uses its statutory authority. *American Trucking*, 531 U.S. at 472-73. And notice-and-comment procedures do not impose substantive limits on an agency's exercise of congressionally conferred power. *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978).

Plaintiffs invoke cases (at 40) stressing that the *availability* of "judicial review is a factor weighing in favor of *upholding* a statute against a nondelegation challenge," *United States v. Garfinkel*, 29 F.3d 451, 459 (8th Cir. 1994) (emphasis added),[2] but they cite no case holding that *preclusion* of judicial review creates a nondelegation problem. And the Ninth and D.C. Circuits have reached the opposite conclusion. *See Michigan Gambling Opposition v. Kempthorne*, 525 F.3d 23, 33 n.8 (D.C. Cir. 2008) ("Nor are we concerned, for purposes of the non-delegation doctrine, that the Secretary's decision … might be unreviewable in a court of law. [The Act] intelligibly guides the

---

[2] *Accord Bowles v. Willingham*, 321 U.S. 503, 516 (1944) (judicial review available); *American Power & Light Co. v. SEC*, 329 U.S. 90, 106 (1946) (same); *United States v. Gordon*, 580 F.2d 827, 839 (5th Cir. 1978) (same); *Amalgamated Meat Cutters of N. Am. v. Connally*, 337 F. Supp. 737, 760 (D.D.C. 1971) (same).

Secretary's exercise of discretion, and that is all that the non-delegation doctrine requires." (citations omitted)); *United States v. Bozarov*, 974 F.2d 1037, 1045 (9th Cir. 1992) ("[T]he [Act]'s preclusion of judicial review does not violate the nondelegation doctrine."). *Touby*, is not to the contrary. There, the relevant statute *did* allow for judicial review, *see* 500 U.S. at 168-69, so the Court did not have to (and did not) say whether the nondelegation doctrine required that result. Plaintiffs' citation (at 40) to Justice Marshall's concurrence proves the point—he (and Justice Blackmun) would have gone further, but the majority did not adopt that position. *See id.* at 169-70 (Marshall, J., concurring). Nor does a passing reference to judicial review in *Consumers' Research* transform the well-established requirements for the non-delegation in injury. True, the Supreme Court "ha[s] asked if Congress has provided sufficient standards to enable both 'the courts and the public [to] ascertain whether the agency' has followed the law." 145 S. Ct. at 2497. But this articulation of the level of specificity required to satisfy the intelligible-principle test does not suggest that the presence or absence of judicial review, writ large, is itself a separate part of the nondelegation inquiry.

Nor do plaintiffs offer any limiting principle to their argument that the nondelegation doctrine requires judicial review to be available. Congress has "plenary" control over the jurisdiction of the lower federal courts, *Patchak v. Zinke*, 583 U.S. 244, 252 (2018), and Congress has exercised that power to bar judicial review in at least 190 extant statutes, Laura E. Dolbow, *Barring Judicial Review*, 77 Vand. L. Rev. 307, 380-400 (2024) (collecting statutes). Agencies have rendered some decisions that were

not reviewable in court since the earliest days of the Nation. *See, e.g.*, *Hayburn's Case*, 2 U.S. 408 (1792); *Decatur v. Paulding*, 39 U.S. 497, 516-17 (1840); *see generally* Nicholas Bagley, *The Puzzling Presumption of Reviewability*, 127 Harv. L. Rev. 1285, 1295-1303 (2014). And the Supreme Court has repeatedly upheld statutes barring judicial review of nonconstitutional claims. *E.g.*, *Block v. Community Nutrition Inst.*, 467 U.S. 340, 352-53 (1984).

## II.    The district court correctly rejected plaintiffs' excise-tax claims.

The district court lacked jurisdiction to consider plaintiffs' excise-tax claims. If this Court disagrees, it should remand to allow the district court to consider the merits of plaintiffs' claims in the first instance. *See Utah v. Su*, 109 F.4th 313, 320 (5th Cir. 2024). But in any event, plaintiffs' claims fail on the merits because the excise tax is not punitive and is reasonable.

### A.    The Anti-Injunction Act and the tax exception to the Declaratory Judgment Act bar plaintiffs' excise-tax claims.

1. "Under the Anti-Injunction Act, Congress has provided that, absent limited exceptions, 'no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person.'" *Franklin v. United States*, 49 F.4th 429, 434 (5th Cir. 2022) (quoting 26 U.S.C. § 7421(a)). "Federal courts lack subject-matter jurisdiction over suits to which the [Anti-Injunction Act] applies." *Hotze v. Burwell*, 784 F.3d 984, 996 (5th Cir. 2015). The tax exception to the Declaratory

Judgment Act similarly bars courts from issuing declaratory judgments "with respect to Federal taxes," 28 U.S.C. § 2201(a).

The Anti-Injunction Act "could scarcely be more explicit" *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736 (1974). "Because of the Anti-Injunction Act, taxes can ordinarily be challenged only after they are paid, by suing for a refund." *National Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 543 (2012) (lead opinion). "Courts have zealously guarded this rule" "that a taxpayer must 'pay first and litigate later.'" *Franklin*, 49 F.4th at 434 (citation omitted). The same rule governs in constitutional and statutory challenges. *Alexander v. Americans United Inc.*, 416 U.S. 752, 759 (1974) ("[D]ecisions of this Court make it unmistakably clear that the constitutional nature of a taxpayer's claim[] … is of no consequence under the Anti-Injunction Act.").

This blanket prohibition against pre-enforcement challenges "also extends to declaratory judgments." *Bob Jones*, 416 U.S. at 732 n.7. As "there is 'little practical difference' between an injunction and anticipatory relief in the form of a declaratory judgment" against a taxing provision, *Jefferson Cty. v. Acker*, 527 U.S. 423, 433 (1999), the Declaratory Judgment Act excludes cases "with respect to Federal taxes," 28 U.S.C. 2201(a). There is "no dispute … that the federal tax exception to the Declaratory Judgment Act is at least as broad as the Anti-Injunction Act." *Bob Jones*, 416 U.S. at 732 n.7.

2. A claim is barred by the Anti-Injunction Act—and therefore by the tax exception to the Declaratory Judgment Act—if (a) the exaction at issue is a "tax"

within the meaning of these statutes, and (b) the purpose of the claim is to "restrain[]
the assessment or collection" of that tax. 26 U.S.C. § 7421(a). Because both
conditions are met, the district court correctly dismissed plaintiffs' excise-tax claim for
lack of jurisdiction. *See Novartis Pharms. Corp. v. HHS*, No. 24-2968, 2025 WL 2619133,
at *5-7 (3d Cir. Sept. 11, 2025) (published).

a. In determining whether a payment qualifies as a "tax" for these purposes,
courts defer to the language Congress used to describe the exaction at issue. That is
because the challenged statute and the "Anti-Injunction Act … are creatures of
Congress's own creation"—thus, "[h]ow they relate to each other is up to Congress."
*NFIB*, 567 U.S. at 544 (lead opinion). As "the best evidence of Congress's intent is
the statutory text," *id.*, Congress's decision to call something a tax—or not—is all but
conclusive.

The Supreme Court's decision in *NFIB* illustrates this reasoning. In reviewing
the constitutionality of the Affordable Care Act's individual mandate, the Court
considered whether the Anti-Injunction Act barred a suit that challenged the payment
levied on those without health insurance. *NFIB*, 567 U.S. at 543-46 (lead opinion).
The Court concluded that it did not: the Affordable Care Act "describe[d] the
payment as a 'penalty,' not a 'tax,'" and "that label [was] fatal to the application of the
Anti-Injunction Act." *Id.* at 564.  The *NFIB* Court explained that this dispositive
reliance on "Congress's choice of label on th[e] question" was grounded in
longstanding precedent. 567 U.S. at 564 (lead opinion). For over a century, the Court

has consistently deferred to congressional labels in determining whether the Anti-Injunction Act applies—even when it ultimately disagreed with the label. For instance, in *Bailey v. George*, 259 U.S. 16, 20 (1922), the Court held that the Act barred a claim challenging a "tax" intended to discourage the use of child labor. But on the same day, the Court also held that this "so-called" child labor tax was, constitutionally speaking, not a tax. *Child Labor Tax Case*, 259 U.S. 20, 38 (1922). Similarly, in *NFIB*, the Supreme Court held that the Affordable Care Act individual mandate penalty was not a tax for purposes of the Anti-Injunction Act but then upheld Congress's imposition of the penalty under the taxing power. 567 U.S. at 564, 574 (lead opinion). The Court has "thus applied the Anti–Injunction Act to statutorily described 'taxes' even where that label was inaccurate." *Id.* at 544. This result follows from the Court's committed deference to the congressional label in this context: where Congress calls something a "tax," it "intend[s] the Anti–Injunction Act to apply." *Id.* at 564.

The Court's reasoning is controlling here, for the statutory text and structure leave no doubt that Congress considered the excise tax to be a "tax" and thus subject to the Anti-Injunction Act. The IRA provision concerning the excise tax is codified in the Tax Code (Title 26 of the U.S. Code), *see* 26 U.S.C. § 5000D; the tax is enforced by the IRS; and—most importantly—Congress describes the exaction as a "tax." *Id.* § 5000D(a) ("There is hereby imposed on the sale by the manufacturer … of any designated drug … a tax …."); *id.* § 5000D(a)(1) (referring to "such tax"); *id.* § 5000D(a)(2) (same); *id.* § 5000D(c) ("Suspension of tax"); *id.* § 5000D(f)(2) (referring

to "the tax imposed by this section"). "Because Congress labeled the exaction a 'tax,' it is a tax within the meaning of the Anti-Injunction Act." *Novartis*, 2025 WL 2619133, at *5.

Plaintiffs' assertion (at 44) that the excise tax is not a "tax" because it is not intended to collect revenue is without merit. Plaintiffs' argument cannot be squared with the statute's "plain text," *Novartis*, 2025 WL 2619133, at * 6, and is foreclosed by decades of Supreme Court precedent making clear that the Anti-Injunction Act "draws no distinction between regulatory and revenue-raising tax rules," *CIC Servs., LLC v. IRS*, 593 U.S. 209, 225 (2021). Contrary to plaintiffs' suggestion, the Act applies as long as "the dispute is about a tax rule," and "[t]hat is just as true when the tax in question is a so-called regulatory tax—that is, a tax designed mainly to influence private conduct, rather than to raise revenue." *Id.* at 224-25.[3]

b. Because the excise tax is plainly a "tax" for these purposes, plaintiffs' excise-tax claim is barred by the Anti-Injunction Act and thus by the tax exception to the Declaratory Judgment Act as long as the purpose of the claim is to "restrain[] the assessment or collection" of that tax. 26 U.S.C. § 7421(a). In addressing that question,

---

[3] Plaintiffs' reliance on a Congressional Budget Office estimate that the excise tax would raise no revenue is misplaced for several reasons. First, "the [Congressional Budget Office] is not Congress, and its reading of the statute is not tantamount to congressional intent." *Sharp v. United States*, 580 F.3d 1234, 1239 (Fed. Cir. 2009). Second, plaintiffs' argument confuses purposes and effects. The excise tax is still a tax even if, by plaintiffs' telling, a manufacturer would not engage in the conduct that would cause the harm the excise tax is designed to remedy. *Cf. United States v. Sanchez*, 340 U.S. 42, 44 (1950) (tax is valid "even [if it] definitely deters the activity taxed").

courts "inquire not into a taxpayer's subjective motive, but into the action's objective aim." *CIC Servs.*, 593 U.S. at 217. That aim is "best assessed" by "look[ing] to the face of the taxpayer's complaint" and, "most especially, … to the relief requested." *Id.* at 217-18 (quotation marks omitted). If the relief requested runs against implementation or collection of the tax itself, the suit is prohibited. *Id.* at 219.

The excise-tax claim squarely targets the tax. *See, e.g.*, ROA.60-65, 77. And the relief requested here to "[e]njoin HHS from enforcing the IRA excise tax" seeks to restrain the assessment or collection of that tax. ROA.79. "These allegations leave little doubt that a primary purpose of this lawsuit is to prevent the [IRS] from assessing and collecting" the excise tax. *Bob Jones*, 416 U.S. at 738.

3. Courts have crafted two exceptions to the Anti-Injunction Act. Neither applies here.

a. In *Enochs v. Williams Packing & Navigation Co.*, the Supreme Court held that the Anti-Injunction Act does not apply when two conditions are met: (1) if the plaintiff will suffer irreparable injury and (2) "if it is clear that under no circumstances could the Government ultimately prevail" even "under the most liberal view of the law and the facts." 370 U.S. 1, 7 (1962). "Unless both conditions are met, a suit for preventive injunctive relief must be dismissed." *Americans United*, 416 U.S. at 758. Plaintiffs' claim fails both prongs.

First, because a refund suit is an adequate remedy, plaintiffs cannot establish that they will suffer irreparable harm absent preemptive injunctive relief. "This is not

a case in which an aggrieved [taxpayer] has no access at all to judicial review." *Bob Jones*, 416 U.S. at 746. A manufacturer that wishes to challenge the excise tax could pay it, seek a refund from the IRS, then sue for a refund in district court or the Court of Federal Claims. *See* 26 U.S.C. § 7422; 28 U.S.C. §§ 1346(a)(1), 1491. And a taxpayer need only pay "the excise tax on a single transaction" before challenging the tax in court. *Rocovich v. United States*, 933 F.2d 991, 995 (Fed. Cir. 1991); *see also Flora v. United States*, 362 U.S. 145, 171-75 nn.37-38 (1960). While such a suit is pending, the IRS generally does not collect the remainder of the excise tax that would otherwise be due. IRS, *Internal Revenue Manual* § 1.2.1.6.4(6), 2007 WL 9790655.

Second, plaintiffs have fallen well short of establishing a "certainty of success on the merits," *Bob Jones*, 416 U.S. at 737; *see infra* pp. 35-41. That bar is not easily met. *See, e.g.*, *Minnesota ex rel. Spannaus v. United States*, 525 F.2d 231, 234-35 (8th Cir. 1975) (holding that second prong of *Williams Packing* test was not met because "[a]lthough the government's analysis may ultimately be found incorrect, we cannot say at this juncture that the argument is made in bad faith"); *Shannon v. United States*, 521 F.2d 56, 61 (9th Cir. 1975) (holding that second prong of *Williams Packing* test was not met where "the court could not have inferred a complete lack of merit in the government's case"). Plaintiffs have not shown that the excise tax is indefensible. *See Novartis*, 2025 WL 2619133, at *7 ("far from certain that Novartis would win on the merits of its [excise tax] claim").

b. A second exception to the Anti-Injunction Act is embodied in *South Carolina v. Regan*, which applies only when Congress has not "provided an alternative avenue for an aggrieved party to litigate its claims," necessitating the party harmed by the tax to find a third party to assert the legal issues. 465 U.S. 36, 381 (1984). Plaintiffs point to no case to support their argument that the *South Carolina* exception can apply based on a taxpayer's ability to pay a tax. The law supports the opposite conclusion. *See Flora*, 362 U.S. at 175 (hardship of prepaying tax does not justify equitable relief against enforcement of tax); *see also id.* at 175 n.38 (applying holding to divisible excise tax). And even putting aside a manufacturer's obvious ability to pay a single instance of this divisible tax, here, plaintiffs have "an adequate remedy; [they] simply [don't] like it." *Larson v. United States*, 888 F.3d 578, 589 (2d Cir. 2018) (requiring the plaintiff to pay a $61 million tax, then seek a refund, before pressing Excessive Fines claim even though the plaintiff alleged he was unable to pay). But preferring to avoid the uncertainty of litigation does satisfy the limited exception provided by *South Carolina.*[4]

c. Finally, to the extent plaintiffs suggest (at 48) that the Anti-Injunction Act itself is unconstitutional as applied to their claims, that novel argument is without merit. The Anti-Injunction Act has been applied for more than 150 years—often to

---

[4] Plaintiffs' assertion that no manufacturer would pay a single instance of an excise tax and then "bet the company on the outcome of refund litigation," Br. 50, undermines their assertion of "certainty of success on the merits," *Bob Jones*, 416 U.S. at 737. If such a course of action carries risk for the manufacturer, then, by definition, success on the merits is less than certain.

constitutional claims—without any hint of a constitutional problem. *See, e.g.*, *United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 10 (2008) ("[T]he taxpayer must succumb to an unconstitutional tax, and seek recourse only after it has been unlawfully exacted"). Congress acts well within its power when it postpones the availability of judicial review. *See Weinberger v. Salti*, 422 U.S. 749, 762 (1975).

### B.   Plaintiffs excise-tax claims are not redressable.

Plaintiffs' Eighth Amendment claims would fail for lack of standing were they not otherwise barred. To show Article III standing, a plaintiff must establish "that [it] suffered an injury in fact that … would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Redressability must be established "for each claim that [the plaintiff] press[es] and for each form of relief that [it] seek[s]." *Id.* at 431.

As the Supreme Court recently reaffirmed in *Haaland v. Brackeen*, 599 U.S. 255, 291-96 (2023), a plaintiff lacks standing to seek declaratory or injunctive relief if it fails to sue the entities responsible for its injuries. *Brackeen* concerned a dispute over the constitutionality of a federal law requiring that Native American children in adoption proceedings be preferentially placed with Native families over non-Native families. *Id.* at 262-63. Certain plaintiffs sought a declaration that these placement preferences were unconstitutional and an injunction preventing their application. The Court held that this claim failed for lack of standing because the entities that implement the statute's placement preferences—state courts and agencies—were not parties to the

lawsuit. *Id.* at 292-94. Neither an injunction nor a declaratory judgment would prevent the non-party state officials from applying the placement preferences. *Id.* And a declaratory judgment against the defendants would thus amount to "little more than an advisory opinion." *Id.* at 293.

Plaintiffs have similarly failed to sue the entities responsible for the alleged harm. Plaintiffs' alleged injury arises from a tax that is assessed and collected by the IRS, which is not a party to the lawsuit. The IRA's tax provisions are codified in the Internal Revenue Code, 26 U.S.C. § 5000D, and the Treasury, of which the IRS is a part, is charged with enforcing Section 5000D and interpreting its provisions. *See id.* § 5000D(h); *see also id.* § 7701(a)(11)(B). Under this authority, the IRS has published notices and regulations implementing the Section 5000D tax. 90 Fed. Reg. 31; IRS Notice.

Treasury and the IRS are thus the only entities responsible for enforcing the excise-tax provisions, but plaintiff have sued neither.[5] The Court cannot enter

---

[5] The Third Circuit erred in concluding that CMS is partially responsible for enforcing the excise tax. *See Novartis*, 2025 WL 2619133, at *4. Tax liability accrues under the statute without any action by CMS, 26 U.S.C. § 5000D, and the only role for CMS is sharing information that may stop, but not start, the accrual of liability, *see* 42 U.S.C. §§ 1320f(a)(4), 1320f-5(a)(6). Additionally, taxpayers must self-report their excise tax liability, *Excise Tax on Designated Drugs; Procedural Requirements*, 89 Fed. Reg. 55,507 (July 5, 2024) (codified at 26 C.F.R. pts. 40, 47), regardless of whether CMS shares any information with the IRS. And the Third Circuit's joinder of IRS and Treasury, *Novartis*, 2025 WL 2619133, at *5, cannot create standing that did not exist when the complaint was filed, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992) (plurality opinion).

judgment against these agencies because they are "not parties to the suit," and they would not be "obliged to honor an incidental legal determination the suit produced." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 (1992) (plurality opinion); *see also id.* at 570-71 ("The short of the matter is that redress of the only injury in fact respondents complain of requires action … *by the individual funding agencies*; and any relief the District Court could have provided in this suit against the Secretary was not likely to produce that action." (emphasis added)). Any injunctive or declaratory judgments issued against HHS and CMS, the only defendants in this action, would not redress plaintiffs' excise-tax injury. Therefore, that claim is not redressable.

### C.    The excise tax complies with the Eighth Amendment.

Plaintiffs' excessive fines claim lacks merit because the excise tax is not a "fine" that implicates the Excessive Fines Clause, nor is it "excessive." These deficiencies provide alternate grounds for affirmance but would best be addressed by the district court in the first instance.

1. The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "Taken together, these Clauses place parallel limitations on the power of those entrusted with the criminal-law function of government." *Timbs v. Indiana*, 586 U.S. 146, 151 (2019) (quotation marks omitted). The Excessive Fines Clause accordingly "limits the government's power to extract payments … as punishment for some offense." *Id.* (quotation marks omitted). Although the form of

proceeding, "civil or criminal," is not entirely dispositive, the question remains whether a particular payment is "punishment for some offense" against the sovereign. *Austin v. United States*, 509 U.S. 602, 610, 622 (1993).

In keeping with the Eighth Amendment's focus on excessive punishment, every Supreme Court case applying the Excessive Fines Clause has involved a forfeiture ordered as a sanction for criminal conduct after an adjudication of guilt in a criminal proceeding, *see United States v. Bajakajian*, 524 U.S. 321, 325-26 (1998); *Alexander v. United States*, 509 U.S. 544, 547-548 (1993), or a civil action brought after the property owner had already been convicted of a crime, seeking forfeiture of property used in the commission of the crime, *see Timbs*, 586 U.S. at 148; *Austin*, 509 U.S. at 605; *see also United States v. Jalaram, Inc.*, 599 F.3d 347, 354 (4th Cir. 2010) ("[T]he [Supreme] Court consistently focused on whether the forfeiture stemmed, at least in part, from the property owner's criminal culpability."); *United States v. Toth*, 33 F.4th 1, 16 (1st Cir. 2022) (rejecting excessive fines challenge where "civil penalty [was] not tied to any criminal sanction"), *cert. denied*, 143 S. Ct. 552 (2023).

The excise tax here, by contrast, lacks any connection to criminal conduct. Liability does not depend on the commission of any crime; it is instead triggered by the lawful choices of the taxpayer in connection with drug sales to Medicare. To defendants' knowledge, neither the Supreme Court nor any other court has ever held that a tax—let alone one that lacks any connection to a criminal offense—implicates

the Excessive Fines Clause. This Court should reject plaintiffs' invitation to break new ground.

2. Even if the excise tax was a fine, it would not be "excessive." A fine violates the Excessive Fines Clause only "if it is grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334. In conducting this inquiry, the Supreme Court has emphasized that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Id.* at 336. Because "Congress is a representative body, its pronouncements regarding the appropriate range of fines … represent the collective opinion of the American people as to what is and is not excessive." *United States v. 817 N.E. 29th Drive*, 175 F.3d 1304, 1309 (11th Cir. 1999). "No matter how excessive (in lay terms) an administrative fine may appear, if the fine does not exceed the limits prescribed by the statute authorizing it, the fine does not violate the Eighth Amendment." *Newell Recycling Co. v. EPA*, 231 F.3d 204, 210 (5th Cir. 2000). That presumption would apply with even greater force in the tax context, as "the appropriate level or rate of taxation is essentially a matter for legislative, and not judicial, resolution." *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 627 (1981).

The excise tax bears a close and proportional relationship to the burdens on the fisc. The tax is imposed only if the manufacturer continues to sell the selected drug to Medicare at a non-negotiated price and only on sales of the selected drug that are reimbursed by Medicare. 26 U.S.C. § 5000D(b); IRS Notice 3. And the ratio of the tax

to the amount charged by the manufacturer falls between 65% and 95%, *see* 26 U.S.C. § 5000D(d); IRS Notice 3-4, which is within the range of constitutional exactions. *See, e.g., United States v. Alt*, 83 F.3d 779, 782-83 (6th Cir. 1996) (81% civil fraud penalty). Indeed, because the tax attaches only to sales of the drug that are reimbursed by Medicare, the tax necessarily recoups only a portion of the outlays that the Medicare program or Medicare beneficiaries have paid for the drug.

Moreover, plaintiffs seek to enjoin their own interpretation of the excise tax, even though the IRS has explained that the tax is far lower than plaintiffs allege. *But see United States v. Hansen*, 599 U.S. 762, 781 (2023) (courts should not "manufacture conflict" between statutory text and Constitution). The IRS has made clear, in a notice that "taxpayers may rely on" now, that a covered taxpayer would owe a $95 tax out of $100 charged for a drug by a manufacturer.[6] *See* IRS Notice at 3, 5. In any event, because plaintiffs bring a facial challenge—before any tax has been assessed or collected—it must establish that the tax is "unconstitutional in all of its applications." *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015) (quotation marks omitted). Therefore, to the extent the parties have a dispute about the applicable rate of tax that would apply, plaintiffs are entitled to relief only if the excise tax is unconstitutional applying IRS's interpretation of its scope and rate.

---

[6] The 95% rate applies only after 270 days have passed, 26 U.S.C. § 5000D(d)(4), and the IRS guidance assumes that the manufacturer does not separately state the tax on its invoice, IRS Notice 3-4.

**III.  The Negotiation Program complies with the Due Process Clause because it does not deprive plaintiffs any protected interests.**

The Negotiation Program does not implicate plaintiffs' due process rights. The Due Process Clause protects against the deprivation "of life, liberty, or property, without due process of law." U.S. Const. amend. V. The threshold "inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). Plaintiffs have not.

Property interests arise from an independent source, such as state or federal law. *See Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). To have a constitutionally protected property interest, "a person clearly must have more than an abstract need or desire for" and "more than a unilateral expectation of" the property. *Id.* Rather, he must have an "individual entitlement" to the property, which "cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982); *see also Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 11-12 (1978)

**A.  Manufacturers lack any a protected property interest in selling their drugs as part Medicare at particular price.**

1. Plaintiffs assertion (at 51-54) that they have a right to sell their drugs as part of Medicare at their preferred price lacks merit. The Second and Third Circuits have correctly rejected parallel claims. *See AstraZeneca Pharms. LP v. HHS*, 137 F.4th 116, 125-26 (3d Cir. 2025); *Boehringer Ingelheim Pharms., Inc. v. HHS*, No. 24-2092, 2025 WL 2248727, at *10 (2d Cir. Aug. 7, 2025) (published).

a. "[N]o one has a 'right' to sell to the government that which the government does not wish to buy." *Coyne-Delany Co. v. Capital Dev. Bd.*, 616 F.2d 341, 342 (7th Cir. 1980) (per curiam). "Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins*, 310 U.S. at 127.

Pursuant to the government's power to determine the prices it will pay for goods and services, other federal agencies have for decades negotiated with drug manufacturers over the price paid for drugs in other government programs. *E.g.*, 38 U.S.C. § 8126(a)-(h). Similarly, as a condition of Medicaid participation, drug manufacturers have long entered into agreements to provide drugs to certain healthcare facilities subject to statutory price ceilings. *See Astra USA, Inc. v. Santa Clara Cty.*, 563 U.S. 110, 113 (2011) (describing requirements under Section 340B of the Public Health Service Act). And the government regularly negotiates the price it will pay for other goods. *See, e.g.*, 48 C.F.R. pts. 15, 215. Just as military contractors have no right to sell their products to the Department of Defense at prices above what the government is willing to pay, "[t]here is no protected property interest in selling goods to Medicare beneficiaries (through sponsors or pharmacy benefit plans) at a price higher than what the government is willing to pay when it reimburses those costs." *AstraZeneca*, 137 F.4th at 125-26.

In negotiating the price that Medicare will pay for drugs, the government is acting as a market participant. The IRA sets the terms of the government's offer to pay for certain drugs. While manufacturers may use their market power to negotiate with the government, they have no right to force the government to pay for their drugs on specific terms. Plaintiffs' contrary view does not reflect how the market works, nor is it consistent with Congress's undoubted authority to control federal spending. The Negotiation Program reflects Congress's judgment that American taxpayers have been spending too much on high-cost prescription drugs, and the government has a strong interest in controlling federal spending to promote the general welfare. *See Sabri v. United States*, 541 U.S. 600, 608 (2004) ("The power to keep a watchful eye on expenditures … is bound up with congressional authority to spend in the first place ….").

Plaintiffs' argument, in part, rests (at 59) on a misunderstanding of the relationship between the Negotiation Program and the rest of the market for prescription drugs. A negotiated price applies only to drugs purchased through Medicare Part B or D. Thus, the Negotiation Program does not control the price paid for a drug by any person who is not a Medicare beneficiary or by any private insurance plan. Nor does the Negotiation Program even control the price paid for Medicare beneficiaries who, for whatever reason, chose to purchase their drugs without using their Part B or D benefits—*i.e.*, who choose to pay cash when filing their prescriptions. *See, e.g.*, 42 C.F.R. § 423.120(c)(3) (permitting an individual at an

in-network pharmacy to request that the pharmacy not bill the individual's Part D

plan). "[T]he Negotiation Program only sets prices for drugs *that CMS pays for* when it

reimburses sponsors" of Parts B and D plans. *AstraZeneca*, 137 F.4th at 126. And the

government may decide how much it is willing to spend on prescription drug

coverage.

b. Contrary to plaintiffs' contention, *Old Dearborn Distributing Co. v. Seagram-*

*Distillers Corp.*, 299 U.S. 183 (1936), does not support their asserted property interest

in deciding "the price at which [they] will sell products." Br. 52-53 (quoting

*Old Dearborn*, 299 U.S. at 192). Citing a line of cases that have since been overruled,

*Old Dearborn* asserted that legislatures generally may not impair "the right of the owner

of property to fix the price at which he will sell" his property in the broader

marketplace. 299 U.S. at 192. But the Supreme Court has since held that the

Constitution does not substantively constrain a legislature's ability to fix the price of

goods. *Olsen v. Nebraska ex rel. Western Reference & Bond Ass'n*, 313 U.S. 236, 247 (1941);

*see also Nebbia v. New York*, 291 U.S. 502, 516 (1934) ("So far as the requirement of due

process is concerned, and in the absence of other constitutional restriction, a state is

free to adopt whatever economic policy may reasonably be deemed to promote public

welfare….."). And *Old Dearborn* itself expressly affirmed the validity of legislation that

allowed parties to fix the price of goods by contract. 299 U.S. at 192. Even on its

terms, it did not recognize a freestanding property right to force a price on an

unwilling buyer.

Plaintiffs fare no better in gesturing to manufacturers' patent rights. "[F]ederal patent laws do not create any affirmative right to … sell anything," *Biotechnology Indus. Org. v. District of Columbia*, 496 F.3d 1362, 1372 (Fed. Cir. 2007) (quotation marks omitted), much less a right to command a particular price, *AstraZeneca*, 137 F.4th at 125. While a patentee may use its exclusive right to sell a drug as leverage in the marketplace, the freedom from competitive pressure conferred by the period of exclusivity does not entitle the patentee to any particular revenue from any particular buyer. Plaintiffs fail to allege any deprivation of patent rights, so those rights may not form the basis of a due process claim.

2. Even if manufacturers could establish a protected interest, the Negotiation Program does not deprive them of anything. Plaintiffs have failed to develop, and thus to preserve, any argument about how the Negotiation Program deprives manufacturers of property beyond their reliance on *Old Dearborn*. But in any event, such arguments would be meritless.

No manufacturer is compelled to participate in the Negotiation Program. As every court to consider the question has concluded, participation in Medicare is a voluntary choice. *See, e.g., Burditt v. HHS*, 934 F.2d 1362, 1376 (5th Cir. 1991); *Baptist Hosp. E. v. HHS*, 802 F.2d 860, 870 (6th Cir. 1986). Participation does not become involuntary just because participation is particularly lucrative. *See, e.g., Garelick v. Sullivan*, 987 F.2d 913, 917 (2d Cir. 1993). A manufacturer with a drug selected for the Negotiation Program has a choice: it may remain in Medicare because it concludes

that the benefits still outweigh the burdens or it may withdraw in as little as 30 days, *see* 42 U.S.C. §§ 1395w-114a(b)(4)(B)(i), 1395w-114c(b)(4)(B)(i); Revised Guidance 33-34; *Bristol Myers Squibb Co. v. HHS*, No. 24-1820, 24-1821, 2025 WL 2537005, at *7-8 (3d Cir. Sept. 4, 2025) (published). Nor is *NFIB* to the contrary. That decision addressed federalism-based limits on the conditions that Congress may attach to money it grants to States. *See NFIB*, 567 U.S. at 578-79 (lead opinion); *see also Bristol Myers*, 2025 WL 2537005, at *6 (rejecting similar argument by highlighting "*NFIB*'s explicit and repeated focus on federalism and the States' role as distinct sovereigns"); *Boehringer*, 2025 WL 2248727, at *8 ("[T]he Supreme Court's holding in NFIB very clearly derived from federalism concerns, *i.e.*, the scope of the federal government's authority to regulate the states."). These limits on Congress's ability to "encourage a State to regulate in a particular way," *NFIB*, 567 U.S. at 576 (lead opinion) (quotation marks omitted), do not similarly restrict the government's ability to procure goods from private companies or support the contention that such offers to pay for goods can be coercive in any constitutional sense.

Plaintiffs' insistence that manufacturers' participation in Medicare is involuntary would be relevant to the due process analysis only to the extent they argue that the government coercion is the mechanism by which manufactures are deprived of their purported interests. Despite plaintiffs' assertion (64 n.8) to the contrary, the Second Circuit in *Boehringer* did not conclude that the Due Process Clause contains an exception for voluntary government programs. Instead, the court held that a

manufacturer cannot allege a deprivation of property because it is coerced to sell drugs at a government-set price when that manufacturer has the option to withdraw from the government program. *Boehringer*, 2025 WL 2248727, at *10. Plaintiffs' reliance (at 63-64) on cases concerning market-wide price-control regimes underscores the lack of a protected property interest in these circumstances. Unlike the provisions challenged in *Bowles*, 321 U.S. at 519-21, in which Congress sought to regulate the price at which any person could lease his property to *any* buyer, the Negotiation Program does not regulate the price at which manufacturers may sell their drugs except in circumstances where a buyer uses Medicare Part B or D to pay for the drugs. *See AstraZeneca*, 137 F.4th at 126 ("These are not private market transactions, regardless of the private hands through which CMS's funds pass."). And plaintiffs offer no sound reason to extend the analysis that applies to market-wide price restrictions to a law that governs only the procedures used to determine the price the government itself is willing to pay.

**B.    The Negotiation Program will not deprive providers of any protected property interests.**

1. Plaintiffs assert that "[p]roviders have a protected interest in being reimbursed [for drugs they administer] on a non-arbitrary basis at a lawful rate," Br. 55, but they fail to recognize that a provider's right to Medicare reimbursement depends entirely on the Medicare Act. The very cases plaintiffs rely on rest on this principle. *See Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 774 (7th Cir. 2021)

("The Providers do not have a legitimate claim of entitlement to whatever rate they believe is appropriate, but they do have a legitimate claim of entitlement to reimbursement *at the rate as established under the law.*" (emphasis added)); *Furlong v. Shalala*, 156 F.3d 384, 393 (2d Cir. 1998) ("[P]rofessionals who provide services under a federal program such as Medicaid or Medicare have a property interest in reimbursement for their services *at the 'duly promulgated reimbursement rate.*'" (emphasis added)). A provider might have a viable claim if CMS deprived it of payment for services already rendered and refused the provider a meaningful opportunity to be heard. But a provider has no due process right to weigh in on what CMS is willing to pay for future administrations of drugs. Indeed, a provider does not even have "a property interest in continued participation or reimbursement" in "federal health care programs." *Shah v. Azar*, 920 F.3d 987, 998 (5th Cir. 2019).

Providers are entitled to be paid for Part B drugs at under the statutory reimbursement formula. *See* 42 U.S.C. § 1395w-3a(b)(1)(A)-(B), (b)(3) (providing the reimbursement formula as 106% of "the volume-weighted average formula of the average sales price" for non-negotiated drugs and 106% of the maximum fair price for drugs selected for the Negotiation Program). Congress has thus established the rate at which plaintiffs are entitled to be reimbursed, and plaintiffs have no "legitimate claim of entitlement" to anything more. *See Rock River*, 14 F.4th at 774; *see also Personal Care Prods., Inc. v. Hawkins*, 635 F.3d 155, 159 (5th Cir. 2011) (Medicaid supplier has no "property interest in its present reimbursement claims while past claims are under

investigation for fraud" because regulations permit reimbursements to be withheld

pending investigations). And plaintiffs reference to their investment of resources into

"developing facilities and processes for administering Medicare-reimbursed drugs,"

Br. 55, is a non-sequitur. Plaintiffs do not allege that the government is depriving

them of their facilities and processes. Nor can a contractor who builds a facility

expecting future government contracts claim entitlement to enough government

largess to make good its investment. *See College Sav. Bank v. Florida Prepaid Postsecondary*

*Educ. Expense Bd.*, 527 U.S. 666, 672 (1999) (explaining that a "generalized right to be

secure in one's business interests" is not "a property right protected by the Due

Process Clause").

2. This Court's decision in *NICA I* does not command a different result. At

that stage in the proceedings, this Court reversed an order dismissing this suit for

improper venue. *See* 116 F.4th 488, 496, 509 (5th Cir. 2024). To resolve that venue

question, this Court first considered a subsidiary question of NICA's Article III

standing. As part of that standing analysis, at the motion-to-dismiss stage, this Court

concluded that NICA "has a concrete interest in not seeing its members' revenue

decrease as a result of allegedly unconstitutional government action." *Id.* at 503. But

"whether a party bringing a due process claim has a 'colorable claim' to a protected

property interest for purposes of standing is a different question from whether, on

consideration of the merits, the party in fact has a protected property interest."

*Boehringer*, 2025 WL 2248727, at *10 n.12 (citing *Booker-El v. Superintendent, Ind. State*

*Prison*, 668 F.3d 896, 899-901 (7th Cir. 2012) (holding that the plaintiff had adequately pleaded an injury-in-fact based on "a substantial risk in losing benefits" but also holding on the merits that the plaintiff lacked a property interest in those same benefits)). *NICA I* did not resolve that merits question, which the government never briefed, during an appeal about standing and venue. And the clear answer is that providers have suffered no deprivation of property.

### C.    Patients have no protected interests implicated by the Negotiation Program.

Plaintiffs assert (at 55, 64-65) that which drugs are selected for the Negotiation Program matters to some patients. The Due Process Clause, however, does not protect any right of access to prescription drugs. *See Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 703-11 (D.C. Cir. 2007) (Due Process Clause does not protect right to experimental drugs); *id.* at 710 n.18 (collecting cases; *cf. Washington v. Glucksberg*, 521 U.S. 702, 735 (1997) (Due Process Clause does not protect substantive right to assisted suicide). Plaintiffs provide no authority to the contrary. And even if plaintiffs could establish a protected interest in the availability of drugs, they fail to show any deprivation of that interest. Plaintiffs' offer only the *ipse dixit* that the Negotiation Program "could result in millions of Americans losing access to their critical medicines," Br. 65, without citation or evidentiary support. That conclusory allegation cannot support a due process claim.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

*Of Counsel:*

ROBERT FOX FOSTER
*Acting General Counsel*

ELIZABETH C. KELLEY
*Acting General Counsel*

JOCELYN S. BEER
*Acting Deputy Associate General Counsel
   for Litigation*

KENNETH R. WHITLEY
ANANT KUMAR
*Attorneys*

*U.S. Department of Health and
   Human Services*

ERIC J. HAMILTON
*Deputy Assistant Attorney General*[*]

JUSTIN R. SIMMONS
*United States Attorney*

MICHAEL S. RAAB

*/s/ Maxwell A. Baldi*
MAXWELL A. BALDI
*Attorneys, Appellate Staff
   Civil Division, Room 7513
   U.S. Department of Justice
   950 Pennsylvania Avenue NW
   Washington, DC 20530
   (202) 532-0211
   maxwell.baldi@usdoj.gov*

SEPTEMBER 2025

---

[*] The Assistant Attorney General is recused in this matter.

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,967 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Maxwell A. Baldi*
MAXWELL A. BALDI