**No. 25-50661**

**IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

NATIONAL INFUSION CENTER ASSOCIATION, *on behalf of itself and its members*; GLOBAL COLON CANCER ASSOCIATION, *on behalf of itself and its members*; PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, *on behalf of itself and its members*,

*Plaintiffs-Appellants*,

v.

ROBERT F. KENNEDY, JR., *Secretary, U.S. Department of Health and Human Services, in his official capacity*; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; MEHMET OZ, *Administrator of the Centers for Medicare and Medicaid Services, in his official capacity*; CENTERS FOR MEDICARE AND MEDICAID SERVICES,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Western District of Texas

**APPELLEES' OPPOSITION TO PETITION FOR REHEARING EN BANC**

*Of Counsel:*

BENJAMIN A. ROBLES
*Acting General Counsel*

ELIZABETH C. KELLEY
*Deputy General Counsel*
*Chief Legal Officer for CMS*

MICHAEL J. GERARDI
*Deputy Associate General Counsel for Litigation*
JOCELYN S. BEER
KENNETH R. WHITLEY
*Attorneys*
*U.S. Department of Health and Human Services*

CODY M. POPLIN
*Deputy Assistant Attorney General*

JUSTIN R. SIMMONS
*United States Attorney*

MICHAEL S. RAAB
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7513*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-0211*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellees are all governmental parties. 5th Cir. R. 28.2.1

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 1

STATEMENT .......... 2

A. Statutory Background .......... 2

B. Prior Proceedings .......... 5

ARGUMENT .......... 6

THE PANEL'S DECISION IS CORRECT. .......... 6

A. The panel correctly rejected plaintiffs' excise tax claims. .......... 6

B. The Negotiation Program complies with the Due Process Clause. .......... 11

C. The Negotiation Program is fully consistent with the nondelegation doctrine. .......... 14

CONCLUSION .......... 16

CERTIFICATE OF COMPLIANCE

## INTRODUCTION AND SUMMARY OF ARGUMENT

To address unsustainable price increases, Congress authorized the Centers for Medicare & Medicaid Services (CMS) to negotiate the prices Medicare pays for certain prescription drugs manufactured by companies that choose to sell drugs to Medicare and Medicaid. Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818 (Act); *see* 42 U.S.C. §§ 1320f(a), 1320f-1(b), (d), (e). This Negotiation Program is a critical tool to achieve the government's policy of "optimiz[ing]" "Federal health care programs[] … to provide access to prescription drugs at lower costs to American patients and taxpayers." Lowering Drug Prices by Once Again Putting Americans First, Exec. Order 14,273, 90 Fed. Reg. 16441, 16442, § 2 (Apr. 18, 2025). With the first negotiated prices having taken effect on January 1, 2026, the Program is saving billions of dollars for seniors and taxpayers.

Plaintiffs press three challenges to the Negotiation Program. They assert that an excise tax imposed by the Act violates the Excessive Fines Clause even though it lacks any connection to criminally culpable conduct and any assessed tax would fall within a range authorized by Congress. They assert that the Act violates the nondelegation doctrine even though the statute provides far more reticulated guidance to CMS than many other statutes whose intelligible principles have been upheld by the Supreme Court. And they assert that the Act deprives them of property without due process even though manufacturers have no constitutional right to dictate prices to the government and may choose to withdraw from the Negotiation Program.

Three other courts of appeals have rejected challenges to the Negotiation Program. The Second, Third, and D.C. Circuits have held that the Program does not deprive manufactures of property without due process; the Third Circuit has also held that the program comports with the nondelegation doctrine and rejected on jurisdictional grounds a pre-enforcement excessive fines claim. *See AstraZeneca Pharms. LP v. HHS*, 137 F.4th 116, 125-26 (3d Cir. 2025), *cert. denied*, 146 S. Ct. 2648 (2026); *Boehringer Ingelheim Pharms., Inc. v. HHS*, 150 F.4th 76, 93-94 (2d Cir. 2025), *cert. denied*, 146 S. Ct. 2658 (2026); *Novo Nordisk Inc. v. HHS*, 154 F.4th 105, 113-14 (3d Cir. 2025), *cert. denied*, 146 S.Ct. 2656 (2026); *Novartis Pharms. Corp. v. HHS*, 155 F.4th 223, 231-34 (3d Cir. 2025), *cert. denied*, 146 S.Ct. 2653 (2026); *Teva Pharms. USA, Inc. v. Kennedy*, 187 F.4th 587, 612-16 (D.C. Cir. 2026), *petition for reh'g en banc filed* (Oct. 2, 2026).

The panel correctly embraced this consensus view and rejected plaintiffs' claims. The petition should be denied.

## STATEMENT

### A. Statutory Background

1. Medicare provides federally funded health coverage for individuals who are 65 or older or who have certain disabilities or medical conditions. Medicare Part B includes coverage for drugs administered by physicians, while Part D subsidizes the costs of outpatient prescription drugs. Op.2.

In enacting Part D, Congress initially barred CMS from negotiating drug prices or otherwise interfering in the arrangements between drug manufacturers and

insurance plans. Op.2. But because of manufacturers' considerable latitude in dictating the prices that Medicare pays for the most expensive drugs, that model led to skyrocketing drug prices, which saddled beneficiaries with unaffordable copays and threatened the long-term solvency of the program. *See* Gov't.Br.5-7.

2. To remedy that problem, Congress created the Negotiation Program and empowered CMS to negotiate the prices Medicare pays for certain prescription drugs. The Negotiation Program applies only to manufacturers that choose to participate in Medicare and Medicaid, and even then, it governs only the prices that Medicare pays for certain drugs. *See* 42 U.S.C. § 1320f-1(b), (d). The Negotiation Program does not control the prices paid for sales outside of Medicare Parts B and D.

By statute, only certain drugs are eligible for selection in the Negotiation Program: those that account for the highest Medicare expenditures, that have no on-market generic/biosimilar competitors, and that have been on the market for at least seven (or eleven) years. *See* 42 U.S.C. § 1320f-1(d), (e). After selecting the drugs, CMS signs a Manufacturer Agreement with those manufacturers that are willing to engage in the negotiation process. Op.3-4. The object of the negotiations is to reach agreement on what the Act terms a "maximum fair price" that Medicare will pay for each selected drug. Op.3 To guide the negotiation process, Congress imposed a "[c]eiling for [the] maximum fair price," which is based on specified pricing data for each drug, 42 U.S.C. § 1320f-3(c), and directed CMS to "aim[] to achieve the lowest maximum fair price" that the manufacturer will accept, *id.* § 1320f-3(b)(1). If

negotiations prove successful, the manufacturer signs an addendum to the Manufacturer Agreement establishing the maximum price at which the drug will be made available to Medicare beneficiaries. Op.4. Negotiated prices generally remain in effect until after a generic/biosimilar competitor is approved and marketed. Op.3.

3. In enacting the Negotiation Program, Congress revised the terms of its offer to continue purchasing drugs for Medicare and Medicaid. A drug manufacturer that does not wish to participate in the Negotiation Program has several options. Because participation in Medicare is a voluntary undertaking, the manufacturer can withdraw from Medicare and Medicaid and avoid all the Negotiation Program's requirements. Op.5 & n.3; *see* 26 U.S.C. § 5000D(c)(1). Alternatively, a manufacturer can transfer its ownership of the selected drug to another entity and continue to sell other drugs to Medicare and Medicaid. Op.5. A manufacturer that pursues neither of these options may also continue to sell the selected drug to Medicare beneficiaries at non-negotiated prices subject to an excise tax. Op.4-5; *see* 26 U.S.C. § 5000D; *see also* IRS, Notice No. 2023-52 (Aug. 4, 2023), https://perma.cc/B9JZ-ZG7P (IRS Notice).

If a manufacturer chooses not to participate in the Negotiation Program, CMS will "facilitate an expeditious termination of" a manufacturer's Medicare agreement before the manufacturer would incur liability for any excise tax, so long as the manufacturer notifies the agency of its desire to withdraw at least 30 days in advance of when the tax would otherwise begin to accrue. Op.5 n.3. The Treasury Department and the IRS issued a notice explaining that, when excise tax liability is triggered, the

tax will be imposed only on the manufacturer's "sales of designated drugs dispensed, furnished, or administered to individuals under the terms of Medicare"—*i.e.*, not on drugs dispensed, furnished, or administered outside of Medicare. IRS Notice 3; *see* Op.4 n.1.

**B. Prior Proceedings**

Plaintiffs facially challenged the Negotiation Program, raising claims under the Excessive Fines Clause, the Due Process Clause, and the nondelegation doctrine. ROA.75-78. The district court initially dismissed plaintiffs' complaint for improper venue after determining that it lacked jurisdiction to hear claims brought by the only local plaintiff. ROA.615-22. A divided panel of this Court held that at least one plaintiff "was not required to channel its claims and that it had established Article III standing." Op.7. On remand, the district court granted summary judgment to the government. ROA.1280-319.

The panel affirmed. Op.28. It held that the Act supplied an intelligible principle to guide CMS's implementation of the Negotiation Program and thus that the Act did not violate the nondelegation doctrine. Op.8-17. It agreed with plaintiffs that it could exercise jurisdiction over their excessive fines claim but held that the Excessive Fines Clause did not apply to the Act's excise tax because it lacked any connection to an offense against the United States. Op.17-23. And it concluded that the Negotiation Program does not deprive any plaintiff of a protected liberty or property interest. Op.23-28.

# ARGUMENT

## THE PANEL'S DECISION IS CORRECT.

### A. The panel correctly rejected plaintiffs' excise tax claims.

1. Plaintiffs' excessive fines claim lacks merit because the excise tax is not a "fine" that implicates the Excessive Fines Clause, and it is not "excessive."

a. The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "Taken together, these Clauses place parallel limitations on the power of those entrusted with the criminal-law function of government." *Timbs v. Indiana*, 586 U.S. 146, 151 (2019) (quotation marks omitted). The Excessive Fines Clause accordingly "limits the government's power to extract payments … as punishment for some offense." *Id.* (quotation marks omitted). Although the form of proceeding, "civil or criminal," is not entirely dispositive, the question remains whether a particular payment is "punishment for some offense" against the sovereign. *Austin v. United States*, 509 U.S. 602, 610, 622 (1993) (quotation marks omitted).

As the panel explained, "a connection to criminality is central to the question whether an exaction is punitive and thus a 'fine' within the Clause's meaning." Op.22. The Supreme Court has only applied the Clause in criminal cases or in civil forfeiture proceedings linked to a criminal conviction. Op.22. The panel properly declined to break new ground by extending the Excessive Fines Clause to a wholly new context. Op.23; *see United States v. Toth*, 33 F.4th 1, 16 (1st Cir. 2022) (rejecting excessive fines

challenge where "civil penalty [wa]s not tied to any criminal sanction"), *cert. denied*, 143 S. Ct. 552 (2023).

b. Even if the excise tax was a fine, it would not be "excessive." A fine violates the Excessive Fines Clause only "if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). In conducting this inquiry, the Supreme Court has emphasized that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Id.* at 336. Because "Congress is a representative body, its pronouncements regarding the appropriate range of fines … represent the collective opinion of the American people as to what is and is not excessive." *United States v. 817 N.E. 29th Drive*, 175 F.3d 1304, 1309 (11th Cir. 1999). "An administrative agency's fine does not violate the Eighth Amendment—no matter how excessive the fine may appear—if it does not exceed the limits prescribed by the statute authorizing it." *Cripps v. Louisiana Dep't of Agric. & Forestry*, 819 F.3d 221, 234 (5th Cir. 2016) (citing *Newell Recycling Co. v. EPA*, 231 F.3d 204, 210 (5th Cir. 2000)). That presumption would apply with even greater force in the tax context, as "the appropriate level or rate of taxation is essentially a matter for legislative, and not judicial, resolution." *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 627 (1981).

Congress expressly authorized the excise tax and its rates, so it cannot be excessive. Yet plaintiffs' petition wholly fails to address this prong of their excessive fines claim. Moreover, the excise tax bears a close and proportional relationship to the

burdens on the fisc. The tax is imposed only if the manufacturer continues to sell the selected drug to Medicare at a non-negotiated price and only on sales of the selected drug that are reimbursed by Medicare. 26 U.S.C. § 5000D(b); IRS Notice 3. Indeed, because the tax attaches only to sales of the drug that are reimbursed by Medicare, the tax necessarily recoups only a portion of the outlays that the Medicare program or Medicare beneficiaries have paid for the drug.

2. Plaintiffs assert (at 10-11) that the panel's decision conflicts with decisions of other Circuits, but that conflict is illusory. Their argument misreads the relevant cases, which involve payments mandated by a heterogenous mix of other federal, state, and local laws. For the most part, they involve civil actions that sought to recover penalties for misconduct that were determined to exceed the loss incurred by the government. *See United States v. Schwarzbaum*, 127 F.4th 259, 272 (11th Cir. 2025) (statute designed so that "the severity of the penalty is tied directly to culpability"); *Grant ex rel. United States v. Zorn*, 107 F.4th 782, 797 (8th Cir. 2024) (treble damages and civil penalties under the False Claims Act), *cert. denied*, 145 S. Ct. 2812 (2025); *Grashoff v. Adams*, 65 F.4th 910, 914-16 (7th Cir. 2023) (penalty for knowing unemployment-benefit fraud, which could have been charged as a crime). Those cases can all be said to involve misconduct. The same is not true here, *see* Op.23, and the panel's excessive-fines holding does not control how such a case would come out in this Circuit.

Plaintiffs also point to decisions from the Ninth Circuit, but those cases do not actually resolve whether the Excessive Fines Clause requires a nexus to criminal conduct. "Judicial assumptions concerning issues that are not contested are not holdings…." *Branham v. Montana*, 996 F.3d 959, 963 (9th Cir. 2021) (cleaned up). And the Ninth Circuit has not squarely confronted the argument that the Excessive Fines Clause applies only to exactions that serve as punishment for some offense. In *Balice v. USDA*, the government did not contest that "imposition of [a] $225,500 fine implicates the Eighth Amendment." 203 F.3d 684, 698 (9th Cir. 2000). And in *Vasudeva v. United States*, the court "[a]ssum[ed]" that civil monetary penalties were fines for purposes of the Excessive Fines Clause and then held that they were not excessive. 214 F.3d 1155, 1161 (9th Cir. 2000). Two decades later, the Ninth Circuit accepted that municipal parking fines implicated the Excessive Fines Clause. *See Pimentel v. City of Los Angeles*, 974 F.3d 917, 922 (9th Cir. 2020). But the Ninth Circuit simply cited to *Balice* and *Vasudeva* and purported to extend those decisions to the municipal context without analysis of whether criminality is required. *Id. Balice* and *Vasudeva*, however, did not resolve that key question. And the municipal defendant in *Pimentel* did not argue that a criminal connection was required to trigger the Excessive Fines Clause. *See* Appellee's Brief at 10-19, *Pimentel*, 974 F.3d 917 (No. 18-56553), 2019 WL 3323819, at *10-19. In short, this question is still open in the Ninth Circuit. *See Branham*, 996 F.3d at 963. Further, each of the fines assessed in these cases

involved misconduct in the form of a violation of a regulatory requirement—a feature not present for the excise tax.

3. This case also presents a poor vehicle to address plaintiffs' broader Excessive Fines Clause argument. Were this Court to grant rehearing, it would be obliged to review the district court's conclusion that the Anti-Injunction Act bars plaintiffs' claim. ROA.1300-06. While the panel adopted a novel exception to the general rule that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person," 26 U.S.C. § 7421(a); *see* Op.18-22, the Third Circuit reached the opposite conclusion in a parallel challenge to the excise tax, *see Novartis*, 155 F.4th at 233. The Third Circuit is correct. *See* Gov't.Br.27-35.

The panel relied on an exception to the Anti-Injunction Act embodied in *South Carolina v. Regan*, which applies only when Congress has not "provided an alternative avenue for an aggrieved party to litigate its claims," necessitating the party harmed by the tax to find a third party to assert the legal issues. 465 U.S. 367, 381 (1984). Plaintiffs point to no case to support their argument that the *South Carolina* exception can apply based on a taxpayer's ability to pay a tax. Judicial decisions support the opposite conclusion. *See Flora v. United States*, 362 U.S. 145, 175 (1960) (hardship of prepaying tax does not justify equitable relief against enforcement of tax); *see also id.* at 175 n.38 (applying holding to divisible excise tax). And even putting aside a manufacturer's obvious ability to pay a single instance of this divisible tax, here, plaintiffs have "an adequate remedy; [they] simply [don't] like it." *Larson v.*

*United States*, 888 F.3d 578, 589 (2d Cir. 2018) (requiring the plaintiff to pay a $61 million tax, then seek a refund, before pressing Excessive Fines claim even though the plaintiff alleged he was unable to pay). Granting en banc rehearing in the face of serious questions about whether the Court could even reach plaintiffs' argument would not be a prudent use of judicial resources.

Further, as noted, plaintiffs' en banc petition does not challenge settled circuit precedent establishing that a fine cannot be excessive if it is within the range set by Congress. *See Cripps*, 819 F.3d at 234. As there is no dispute that Congress spelled out the amount of the excise tax, resolving the question posed in plaintiffs' petition would have no practical effect on the outcome of their facial challenge to the tax.

### B. The Negotiation Program complies with the Due Process Clause.

1. The Negotiation Program does not implicate plaintiffs' due process rights. The Due Process Clause protects against the deprivation "of life, liberty, or property, without due process of law." U.S. Const. amend. V. The threshold "inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). As the Second, Third, and D.C. Circuits agree, the Negotiation Program does not deprive manufacturers of any property right. *See AstraZeneca*, 137 F.4th at 125-26; *Boehringer*, 150 F.4th at 93-94; *Teva*, 187 F.4th at 612-16.

"[N]o one has a 'right' to sell to the government that which the government does not wish to buy." *Coyne-Delany Co. v. Capital Dev. Bd.*, 616 F.2d 341, 342 (7th Cir. 1980) (per curiam). "Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940). Thus, "[t]here is no protected property interest in selling goods to Medicare beneficiaries (through sponsors or pharmacy benefit plans) at a price higher than what the government is willing to pay when it reimburses those costs." *AstraZeneca*, 137 F.4th at 125-26.

2. Plaintiffs' arguments for invoking the Due Process Clause lack merit.

Plaintiffs primarily argue (at 12-14) that the Negotiation Program dictates prices for private transactions implicating the limitations placed on market-wide price-control regimes in *Bowles v. Willingham*, 321 U.S. 503 (1944). The Act, however, simply sets the terms of the government's offer to pay for certain drugs; it does not "regulat[e] prices throughout the private … market" like the statute in *Bowles*. *Teva*, 187 F.4th at 615. Plaintiffs' argument, in part, rests on a misunderstanding of the relationship between the Negotiation Program and the rest of the market for prescription drugs. As the panel correctly recognized, Op.24, the negotiated price applies only to drugs purchased through Medicare Part B or D. Thus, the Negotiation Program does not control the price paid for a drug by any person who is not a Medicare beneficiary or by any private insurance plan. Nor does the Negotiation

Program even control the price paid for Medicare beneficiaries who, for whatever reason, choose to purchase their drugs without using their Part B or D benefits—*i.e.*, who choose to pay cash when filling their prescriptions. *See, e.g.*, 42 C.F.R. § 423.120(c)(3) (permitting an individual at an in-network pharmacy to request that the pharmacy not bill the individual's Part D plan). "[T]he Negotiation Program only sets prices for drugs *that CMS pays for* when it reimburses sponsors" of Part D plans and Part B providers. *AstraZeneca*, 137 F.4th at 126; *see Teva*, 187 F.4th at 615. And the government may decide how much it is willing to spend on prescription drug coverage.

Plaintiffs also assert (at 14-15) that their participation in Medicare and Medicaid is somehow involuntary. Every court to confront that argument has rejected it. *See Boehringer*, 150 F.4th at 88 n.7 (collecting cases). The panel correctly embraced that consensus view. Op.25-26. "Medicare participation should not be considered involuntary because" it is economically lucrative to manufacturers "given that 'economic hardship is not equivalent to legal compulsion.'" Op.26.

Tenth Amendment anticommandeering cases do not change that analysis because the manufacturers are not sovereign States. Op.26. Nor does the analysis in *Goldberg v. Kelly*, 397 U.S. 254 (1970), help plaintiffs. *Goldberg* recognized a protected interest in welfare benefits, *id.* at 262 & n.8, because the litigants there had a continuing statutory entitlement to receive those benefits, *see Ridgely v. FEMA*, 512 F.3d 727, 735-37 (5th Cir. 2008). Without a continuing entitlement, however, the Due Process Clause

does not apply. *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). And this Court has made clear that Medicare suppliers have no such entitlement. *See Personal Care Prods., Inc. v. Hawkins*, 635 F.3d 155, 159 (5th Cir. 2011); *see also Shah v. Azar*, 920 F.3d 987, 997-98 (5th Cir. 2019).

Plaintiffs fare no better in pointing (at 15-16) to an earlier panel decision in this case holding that one plaintiff had standing to raise a due process claim. As the panel in this case recognized, the earlier "analysis performed for jurisdictional purposes does not resolve the question on the merits here. … [W]hether a party bringing a due process claim has a 'colorable claim' to a protected property interest for purposes of standing is a different question from whether, on consideration of the merits, the party in fact has a protected property interest." Op.24 n.5 (quotation marks omitted); *see Boehringer*, 150 F.4th at 94 n.12; *Booker-El v. Superintendent, Ind. State Prison*, 668 F.3d 896, 899-901 (7th Cir. 2012). Plaintiffs have no answer for that basic flaw in their argument.

### C. The Negotiation Program is fully consistent with the nondelegation doctrine.

As the panel explained, the Act establishes the Negotiation Program, defines key terms, and sets out a framework for negotiations. Op.10-11. It requires CMS to offer a price between a ceiling of "'75 to 40 percent of a benchmark' and a floor in the requirement that a price be 'justified' based on [certain] statutory factors." Op.12 (quoting *Novo Nordisk*, 154 F.4th at 114). Congress has thus "made clear both the

general policy that the agency must pursue and the boundaries of its delegated authority." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025); *see id.* at 683-84 (collecting cases). The Act therefore comports with the nondelegation doctrine. *See* Op.12-13.

As the panel further explained, neither preclusion of judicial review nor a lack of notice-and-comment rulemaking offend the nondelegation doctrine. Op.15-16. The panel held that even if preclusion might be a problem in some case, "the constitutionality of the [Act]'s delegation is not so close that such preclusion would change the outcome." Op.15. And because notice-and-comment rulemaking is neither constitutionally required nor a substantive constraint on rulemaking, it "has little relevance to 'the constitutional question' at the heart of a delegation challenge, which 'is whether the statute has delegated legislative power to the agency.'" Op.16. Plaintiffs fail to meaningfully address any of these flaws in their nondelegation argument.[1]

***

CMS has now selected several rounds of drugs and negotiated prices; manufacturers have implemented the first round of prices. And plaintiffs' parade of horribles has not materialized. Instead, the Program has resulted in billions of dollars

[1] The government advanced a different rationale for why plaintiffs' "combination theory" failed. Gov't.Br.22-27; *see Consumers' Rsch.*, 606 U.S. at 696-97. Although the panel did not adopt this precise argument, it nonetheless reached the correct result, and further review is not warranted.

in savings for the fisc and Medicare beneficiaries. Plaintiffs now ask this Court to hold the Program unlawful and thus to reimpose higher costs for seniors at pharmacy counters. This Court should reject plaintiffs' invitation to disrupt this crucial program.

## CONCLUSION

The petition should be denied.

Respectfully submitted,

CODY M. POPLIN
*Deputy Assistant Attorney General*[*]

JUSTIN R. SIMMONS
*United States Attorney*

MICHAEL S. RAAB

*/s/ Maxwell A. Baldi*
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7513*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-0211*
*maxwell.baldi@usdoj.gov*

*Of Counsel:*

BENJAMIN A. ROBLES
*Acting General Counsel*

ELIZABETH C. KELLEY
*Deputy General Counsel*
*Chief Legal Officer for CMS*

MICHAEL J. GERARDI
*Deputy Associate General Counsel for Litigation*

JOCELYN S. BEER
KENNETH R. WHITLEY
*Attorneys*

*U.S. Department of Health and Human Services*

NOVEMBER 2026

[*] The Assistant Attorney General is recused in this matter.

## CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limit of Federal Rule of Appellate Procedure 40(d)(3)(A) and (4) because it contains 3,894 words. This response also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Maxwell A. Baldi*
MAXWELL A. BALDI